**In re C. Earl BOWDEN, Jr., Debtor.**

**CDR Robert C. Elrod, USNR, Plaintiff,**

v.

**C. Earl Bowden, Jr., Defendant.**

**Bankruptcy No. 04–71570–SCS.**
**Adversary No. 04–7100–SCS.**

United States Bankruptcy Court,
E.D. Virginia,
Norfolk Division.

March 18, 2005.

Ellen C. Carlson, Roussos, Langhorne and Carlson, P.L.C., Norfolk, VA, for Debtor.

Peter G. Zemanian, Zemanian Law Group, Norfolk, VA, for Plaintiff.

## MEMORANDUM OPINION

STEPHEN C. ST. JOHN, Bankruptcy Judge.

■ This matter came on for trial on November 9, 2004, on the Plaintiff's Complaint to Determine Dischargeability of Debt under Sections 523(a)(2)(A) and 523(a)(2)(B) of the United States Bank-

ruptcy Code.[1] At the conclusion of the trial, the Court took this matter under advisement. The Court has jurisdiction over these proceedings pursuant to 28 U.S.C. §§ 157(b)(2) and 1334(b). Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409. Upon consideration of the evidence and arguments presented by counsel at the trial and of the pleadings submitted by each party, including the stipulations of fact submitted by the parties, the Court makes the following findings of fact and conclusions of law.

## I.

## FINDINGS OF FACT

The Defendant/Debtor, C. Earl Bowden, Jr., ("Bowden") is a professional realtor and associate broker. Tr. at 109–10. The Plaintiff, Commander Robert C. Elrod,

USNR, ("Elrod"), became acquainted with Bowden in 1995 when Bowden served as the real estate agent for Elrod and his wife, Shannon. Elrod was referred to Bowden by a friend of Elrod's who had also used Bowden as his real estate agent. Tr. at 4, 39, 110. Elrod˙ testified that, throughout the time that he has known Bowden, he has always viewed him as his realtor. Tr. at 38.

In the years between the purchase of his home and the transaction at issue, Elrod had occasional contact with Bowden. Tr. at 18. Elrod testified that Bowden "initiated and arranged two investment opportunities" with former clients of Bowden's, one in 1995, and the other in 2000. Tr. at 4, 12, 18. These transactions occurred because Bowden mentioned, in the course of his service as Elrod's real estate agent,

---

1. The Plaintiff's Complaint to Determine Dischargeability of Debt also contained two additional counts upon which he contended that the Defendant's debt should be determined nondischargeable. Counts Three and Four of the Complaint sought a determination of dischargeability under 11 U.S.C. § 523(a)(4). Count Three alleged that the Defendant's debt should not be discharged because the Defendant committed a defalcation while acting in a fiduciary capacity. Count Four alleged that the Defendant's conduct constituted embezzlement. *See* Pl. Compl. ¶¶ 24–25, 28–30. On October 28, 2004, the Plaintiff, by counsel, filed a Statement of Narrowing of Issues, in which he stated that, based upon his review of the evidence, he intended not to pursue Count Four of his Complaint.

 At the conclusion of the Plaintiff's evidence, the Defendant moved to dismiss the Plaintiff's Complaint in its entirety. Tr. at 79. The Defendant's motion was granted as to Count Three. The Court found that, based upon the law announced by this Court in its earlier decision in *KMK Factoring, L.L.C. v. McKnew (In re McKnew)*, 270 B.R. 593 (Bankr.E.D.Va. 2001), the Plaintiff's evidence was insufficient with regard to the level of trust necessary to impose a fiduciary relationship so as to find that a defalcation occurred. Tr. at 85. More

 particularly, the Court found that no express trust existed between the parties, nor was there any other agreement between the parties imposing such a relationship. The fact that the Defendant is a realtor alone is insufficient to impose a position of trust. Instead, the Court found that the transaction more closely resembled an arms-length transaction. Therefore, the motion to dismiss as to Count Three was granted. Tr. at 85–86.

 The motion was denied as to Counts One and Two, which allege that the Defendant obtained money by false pretenses, a false representation, or actual fraud, and that he obtained money by use of a written statement that was materially false as to the Defendant's financial condition on which the Plaintiff reasonably relied and that the Defendant made with the intent to deceive. *See* 11 U.S.C. §§ 523(a)(2)(A), (B) (2004). The Court found that, with respect to both counts, the Plaintiff had made a prima facie case. The Court also found that a clear factual disagreement existed on these issues, which placed the Court in a position where it must weigh the facts, determine the credibility of the evidence, and make a determination as to the nature of transaction. Tr. at 86–88. Therefore, the remainder of this Memorandum opinion will address only Counts One and Two of the Plaintiff's Complaint.

that he occasionally had investment opportunities in the form of loan transactions, and Elrod expressed interest in participating in these types of transactions. Bowden testified that Elrod mentioned that Elrod made investments in the stock market. Elrod stated that he may have mentioned investments in mutual funds, but did not recall mentioning stock investments. Tr. at 12, 110–11, 126, 137. Elrod testified that he was only interested in low-to-no risk investments and would have never expressed interest in a high risk investment. Tr. at 137. He was unable to recall whether he mentioned to Bowden that he was interested in high return investments. Tr. at 138. Elrod also testified that on one occasion, Bowden invited he and his wife to a social gathering at his house, but that they did not attend. Elrod and his wife would also sporadically call Bowden to inquire as to the state of his health. Tr. at 18.

Bowden did not participate in the two investment transactions, but rather "just arranged the deal." Bowden also had the paperwork drafted. Tr. at 12, 138. Both of these transactions were similar to each another in that the loans by Elrod were secured by a deed of trust on the respective real estate involved in the particular transactions, and Elrod visited the properties serving as security. Tr. at 13, 15, 20, 30, 35. Bowden did not receive any commission or compensation as a result of these transactions. Tr. at 40, 112. Elrod further stated that he did not ask either of the other parties involved in those transactions for any financial statement, but that if Bowden had advised him to do so, he would have. He stated that "I was going on [Bowden]'s advice and guidance that these were sure wins." Tr. at 137.

Approximately five to seven days prior to December 23, 2002, Elrod received a telephone message from Bowden, in which

Bowden stated that he had an investment opportunity to discuss with Elrod. Elrod spoke to Bowden on the telephone on December 22, 2002. Tr. at 5–6, 19. According to Elrod, Bowden told him that he needed the money because he was "arranging a deal on some real estate for another client and that approximately $20– to $25,000 was needed in short order to be able to pull the deal together." Tr. at 6; *see also* Tr. at 20. Elrod specifically testified that Bowden never told him that he needed the money to cover personal obligations, nor did Bowden ever intimate that he was in financial distress. Had Bowden so stated, Elrod testified that this would have affected his decision to lend money to Bowden. Tr. at 7,9–10. When questioned by counsel for Bowden, Elrod testified that Bowden did not make any written financial representations either about his assets, his liabilities, or his income. Tr. at 28–29. Bowden confirmed that he never tendered a personal financial statement with regard to his income, expenses, assets, or liabilities to Elrod, nor did Elrod request such statements. Tr. at 121, 125.

Bowden elaborated on the circumstances that brought him to ask Elrod for money. His mother passed away in October, 2002, and his real estate commissions were not coming in as he had expected. Tr. at 114. When he spoke to Elrod, Bowden testified, contrary to Elrod's statements, that he told Elrod that he needed the money for "personal debt, personal use." Tr. at 41, 114. Specifically, Bowden stated that "I made it clear that I was in personal trouble, that I needed personal funds for personal debt and personal use." Tr. at 40. Bowden did not "know how much detail [he] went into, but it was clear that this was a different type of loan. This was a personal loan." Tr. at 41. Bowden testified he did not tell Elrod the severity of his financial circumstances. At the time he approached Elrod, Bowden testified

that his financial problems were not "as severe as it ultimately ended up being." Tr. at 59. Along these lines, he stated that "It's not my habit to discuss in great detail my financial situation with anyone." This included his tax liens and his obligations to Peter Suprenant and Gabriel & Company. Tr. at 130. Bowden testified that there was no reference to a third-party transaction other than that which is contained in the Note. Tr. at 41. However, Bowden later testified that "I'm sure I implied that I need it for personal reasons" and not for a business transaction. Tr. at 129.

On December 23, 2002, Bowden and Elrod met at Elrod's house. At that time, Bowden executed a promissory note in favor of Elrod in the amount of $25,000.00 ("Note"). The Note provides, among other things, that Bowden would repay to Elrod the sum of $27,500.00 on or before February 23, 2003. Pl.Ex. 10. The Note also provides:

> The indebtedness evidenced by this Note is secured by the proceeds to be distributed from any transaction concerning the Makers [sic] residence, located at 582 W. Ocean View Ave. Norfolk, Va. 23503 or any proceeds resulting from the property located at 1000 E. Ocean View Ave. Norfolk, Va. 23503., (AKA/9710 Chesapeake St.) the Makers [sic] place of business. The settlement agent, Advance Title and Abstract, is hereby instructed to pay this note from the first of the above transactions.

Id. This document was prepared by Bowden. Tr. at 7, 41. That same day, Elrod remitted two checks dated December 23, 2002, and payable to Bowden, one in the amount of $15,000.00 and the other in the amount of $10,000.00. Pl.Ex. 11.

Elrod also testified as to discussions he had with Bowden regarding Bowden's assurances of repayment. Elrod testified that "[t]he only way I would have gotten into this loan and also with the previous other two loans is if I was assured that there was security and collateral to cover the loan in case it could not be paid." Tr. at 8; see also Tr. at 10. According to Elrod, he understood that Bowden was giving as security for the loan his residence and his real estate place of business; Elrod stated he "wouldn't have done the loan without that." Tr. at 8. Elrod further testified that "[i]t was explained to me that this was security if he could not pay off this debt, that these would be the collateral that I could go after or foreclose on to generate money that would pay back the note, which was the same thing that we had arranged for the prior two loans." Tr. at 24.

Bowden testified to the contrary. According to Bowden, the references to the properties located at 582 West Ocean View Avenue and 1000 East Ocean View Avenue were included "[b]ecause it was clearly written that the repayment was to come from the proceeds from transactions related to either of these properties." Bowden had contracts on the 582 West Ocean View Avenue property, to which he held the power of attorney from the sole heir (his son) in order to conduct transactions regarding that property, and that he "listed 1000 East Ocean View as a . . . bonus, an extra source of funds." Tr. at 42. Bowden stated he "had no reason to believe [the contracts] were not going to close." Tr. at 116. Bowden testified that he executed the $25,000.00 Note with repayment due in two months because he "had full intent on it being able to happen. . . . [T]hese are more personal friends, more personal clients than the average people. I would never intend on hurting them. If I didn't think I could have repaid it, I would never have made the statement." Tr. at 115–16. Bowden affirmatively stat-

ed that he did not deceive Elrod nor did he intend to deceive him, but instead, that he intended to repay Elrod from the proceeds from the transaction regarding 582 West Ocean View Avenue. Tr. at 122.

According to Elrod, Bowden never informed Elrod that he did not own the properties located at 582 West Ocean View Avenue and 1000 East Ocean View Avenue. Tr. at 10. Instead, Elrod relied on the fact that Bowden offered the property as security for the loan, Bowden's previous statement that he "had a home on Ocean View," and that Elrod had been invited to Bowden's home for a social event, being evidence to him that Bowden owned the 582 West Ocean View Avenue property. Tr. at 22. Elrod also relied on a business card given to him by Bowden that contained the name of Coastal Realty Group and its address as 1000 East Ocean View Avenue, as well as Bowden's statements that "he was part of Coastal Realty and that he would put that up as security or collateral" if he were unable to repay the loan, as evidence to him that Bowden owned the property located at 1000 East Ocean View Avenue. Tr. at 22. Elrod was unaware at the time that another business owned by Bowden, Ocean View Water Sports, was also located at the 1000 East Ocean View Avenue address. Tr. at 22. Bowden confirmed that he never gave Elrod his business card from the Ocean View Water Sports business. Tr. at 129. Elrod did not investigate or visit Bowden's properties because, in his view, this loan was "different" in that the money was lent directly to Bowden and, based on the previous loan transactions arranged by Bowden, Elrod "trusted [Bowden] completely in his judgment." Tr. at 21; *see also* Tr. at 30. Bowden confirmed that he never took Elrod to look at the 1000 East Ocean View Avenue property but stated that Elrod had been to that property at another point in time. Tr. at 128.

Bowden did not tell Elrod that he would only be receiving a commission from any sale of the 582 West Ocean View Avenue property since he did not own it. Tr. at 54. Bowden also did not tell Elrod that he did not own the 582 West Ocean View Avenue property; however, he referred to it as his residence because he lived there. Similarly, he did not tell Elrod that he did not own 1000 East Ocean View Avenue. Tr. at 43, 66, 115, 130. According to Bowden, he has never had an ownership interest in Coastal Realty. He did, however, have an interest in another business located at 1000 East Ocean View Avenue, Ocean View Water Sports. He was actively seeking to sell this business at the time Elrod made the loan. Tr. at 75–76. He never told Elrod that the business to which he referred when mentioning 1000 East Ocean View Avenue was Ocean View Water Sports, though Bowden stated that "there is a neon sign on the side of the building that is fifteen feet long that says Ocean View Water Sports." Tr. at 127–28.

Elrod did not learn until the first Section 341 meeting of creditors in Bowden's bankruptcy case that Bowden did not own 582 West Ocean View Avenue. At that time, Elrod learned that Bowden had disclaimed his interest in that property approximately ten days prior to Elrod loaning him the money; he also learned that Bowden held a power of attorney from his son relating to that property. Tr. at 37–38.

Bowden confirmed that he disclaimed his interest in the 582 West Ocean View Avenue property on December 12, 2002; the property was actually owned by his mother, who had passed away on October 15, 2002. Tr. at 43–44 (referencing Pl.Ex. 6). Bowden filed an intestacy affidavit with Norfolk Circuit Court on March 24, 2003. On the affidavit, he checked the line

on the affidavit that states "I have an interest as son in the real property of the decedent," although, as he testified, his interest came solely from his status as a child of the decedent, not because he had any ownership interest in the property. The decedent is listed as his mother, Louise H. Miller, and the property is listed as 582 West Ocean View Avenue, Norfolk, Virginia. Tr. at 48, 73; Pl.Ex. 12. Bowden was appointed the administrator of his mother's estate on November 12, 2003. Tr. at 52–53.

Elrod specifically asked Bowden whether a deed of trust was necessary, because he had deeds of trust in the other two loan transactions that Bowden had arranged for him. He testified that he relied on Bowden's statement and guidance as to what paperwork was necessary, and specifically, Bowden's representation that a deed of trust was not necessary, but instead that the Note would suffice for recordation purposes. Tr. at 8–9, 35. Bowden was unable to say whether or not he told Elrod that a deed of trust would have been necessary for their transaction, but did state that "we sent our documents immediately to Debbie Ferguson, who was instructed at that time to—had she completed a rough HUD in January, she would have shown that she had been instructed to pay Mr. Elrod from my proceeds, from my commissions." Tr. at 63. Bowden stated that there was no deed of trust associated with the loan from Elrod because "[i]t was not secured by property. It was secured by the proceeds from the transactions, as it reads." Tr. at 75. Bowden confirmed that instructions to a closing agent do not take the place of a deed of trust. Tr. at 63.

Debra Ferguson, a title underwriter and escrow officer for Advance Title and Abstract, Inc. testified on behalf of Bowden. She has known Bowden and performed closings for him for more than eleven years. Tr. at 97–98. She is familiar with the 582 West Ocean View Avenue property, as she has researched the title to that property on several occasions. Tr. at 98. Ms. Ferguson confirmed that she received a copy of the Note on December 23, 2002. She placed the Note in a file concerning the property at 582 West Ocean View Avenue to ensure that Elrod or his assigns would be paid from the proceeds of the sale of the property. Tr. at 101. She did not recall Bowden changing his instructions with regard to paying Elrod on the Note. Tr. at 101–02.

In his testimony, Bowden referenced three separate contracts for the property and condominiums located at 582 West Ocean View Avenue, the commissions from which Bowden intended to pay Elrod. Tr. at 55; *see* Pl.Ex. 7. Bowden had confidence that the contracts with Mr. Ramsey would close because he had previously sold Mr. Ramsey property and also co-owned some other property with him. Tr. at 116.

Bowden also discussed the "rough" settlement statement relating to Unit B located at 582 West Ocean View Avenue. *See* Pl.Ex. 15. Bowden explained that "rough" HUD statements are typically produced just prior to an anticipated closing so that the parties involved know how the proceeds of the sale will be distributed. Tr. at 56. Ms. Ferguson concurred as to the purpose of a "rough" HUD statement. Tr. at 102.

Ms. Ferguson also explained why there were three contracts on the 582 West Ocean View Avenue property. According to her, the buyer's initial lender was brokering the loan to a second lender. The property at 582 West Ocean View Avenue actually contained two condominium units, known as Unit A and Unit B respectively. The second lender desired that separate contracts be executed for the separate condominium units, thus resulting in one con-

tract for the entire 582 West Ocean View Avenue property, and one contract each for Units A and B. Tr. at 104.

Bowden confirmed that the statement shows no commission distribution, as well as the fact that the statement showed only approximately $7,740.00 cash available to the seller. Tr. at 57. Bowden interjected that the "rough" HUD statement was prepared on May 29, 2003, in contrast to the originally anticipated closing date at the end of December, and in his opinion, "these numbers aren't relevant from January in May." He further testified that, had the contract closed in December, there would have been sufficient funds to pay a commission for the sale. Tr. at 57–58, 63. Bowden did confirm that the payoffs listed in the HUD statement included a first mortgage to Ohio Savings Bank; a second mortgage to Heritage Bank and Trust; and a payoff to Allen Gordon for Gabriel & Company. No payoff was listed for Elrod because he did not have a deed of trust. Tr. at 58.

Ms. Ferguson explained in her testimony that, because the debt to Elrod was not the seller's obligation (the seller being Christopher Bowden, son of Earl Bowden, and the sole heir of the estate of Louise Miller), that debt would not have appeared on the HUD statement. Tr. at 100–03. Rather, the instruction to pay a sum of money to Elrod went to the disbursement of the commission on the real estate sale which Bowden was to receive. Tr. at 103.

Bowden testified that Unit B at 582 West Ocean View Avenue did eventually sell in April, 2004. Bowden's role in that sale was that of the executor of his mother's estate; he did not receive any commission from this sale, as he was trying to keep the money in his mother's estate. Tr. at 135. Christopher Bowden, the owner of the property as a result of his father's disclaimer in interest, testified that

he executed the deed to convey this property, and that the proceeds from the sale went to his grandmother's estate. Tr. at 91. Ms. Ferguson also testified with regard to this sale. She stated that because Christopher Bowden owned that property, and because she did not have any instructions from Christopher to make any payment out of the proceeds of that sale transaction, the proceeds from that sale did not go to Elrod. Tr. at 105.

At the time that the loan was made, Bowden testified that he had several other outstanding financial obligations about which he did not inform Elrod. These obligations included tax liens in excess of $145,000.00; a $30,000.00 obligation in favor of Peter Suprenant; and a judgment order in the amount $47,500.00 in favor of Gabriel & Company. Tr. at 60–61; see Pl.Ex. 2; Pl.Ex. 3; and Pl.Ex. 5. Bowden could not confirm whether a writ of fieri facias taken out by Gabriel & Company on December 19, 2002, had been served upon him prior to Elrod making the loan. Tr. at 62, 70. Bowden clarified that, while the obligation to Mr. Suprenant was outstanding at the time that Elrod made the loan at issue, the confession of judgment offered into evidence as Plaintiff's Exhibit 3 was not entered against Bowden until almost a year after Elrod's loan. Bowden also stated that the debt in favor of Frederick Gabriel was paid in April, 2004, after the closing on one of the 582 West Ocean View Avenue condominium units. Tr. at 68–69.

Elrod also testified that, after Bowden failed to pay the loan amount by February 23, 2003, he began contacting Bowden to determine what was going to happen regarding the loan repayment. Elrod confirmed that Defendant's Exhibit F represents a letter sent to Bowden on April 16, 2003. Tr. at 32; Def. Ex. F.

Elrod's wife, Mrs. Shannon M. Elrod, testified that she spoke with Bowden in

March, 2003, when Bowden stopped by the Elrods' home. She assumed Bowden visited them in response to messages that her husband had left for him. Bowden told her at that time that he would repay the funds borrowed and that he would increase the amount to $30,000.00. When Bowden advised her he could pay that amount within two weeks, Mrs. Elrod told him that if he was unsure that he could pay the money within two weeks, it would be fine if he could pay the money by April 15, 2003, and Bowden agreed. Tr. at 77–78, 121. She further testified that there was no discussion as to an interest rate if he was unable to make the payment he orally obligated himself to make. Tr. at 78. Bowden testified that he agreed to increase the repayment on the loan to $30,000.00 out of "good faith" because "[his] intent was still to repay it. I knew that I was inconveniencing them." Tr. at 123. Bowden later confirmed in writing his agreement to increase the amount to be paid to Elrod to $30,000.00.[2] Bowden did eventually repay $10,000.00 of the loan in two separate, $5,000.00 payments, one in April, 2003, and one in June, 2003. Tr. at 36.

Bowden testified that the Note did not provide for interest on the repayment, but did affirm that he promised to repay Elrod $27,500.00 two months after he borrowed the $25,000.00 sum. Bowden interpreted the language of the Note as not providing for interest but instead, of providing for a "profit" for making the loan. Tr. at 64–65. According to Elrod, the repayment sum of $27,500.00 was not so much negotiated as it was offered by Bowden. In determining whether to make the loan to Bowden, one of the factors Elrod took into account was

the amount of repayment as compared to the amount that he could earn on the money in a bank account in that same period of time. Tr. at 138–39.

Bowden also discussed his history of earning commissions in the years preceding the loan from Elrod. In 2000, Bowden earned $199,914.00 in real estate commissions. Tr. at 117; Def. Ex. P. Bowden earned $193,745.00 in real estate commissions in 2001. Tr. at 119; Def. Ex. Q. Bowden's 2002 Federal Tax Return noted commissions from Coastal Realty Group of $195,112.00. Bowden elaborated that he also sustained some losses in 2002 relating to Ocean View Water Sports (which is located at 1000 East Ocean View Avenue) and Mick's Pancakes, business interests which he acquired in 2002. Tr. at 119; Def. Ex. R. According to the schedules attached to his 2002 Federal tax return, Bowden had a loss of $36,010.00 with regard to Ocean View Water Sports, and a loss of $62,147.00 as to Mick's Pancakes. *Id.* Finally, Bowden earned commissions of $201,100.00 in 2003. Tr. at 120; Def. Ex. S. Along these lines, Bowden testified that his gross commissions for the final quarter of 2002 were approximately $38,000.00, and for the first two quarters of 2003 combined, his commissions were approximately $86,000.00. Bowden opined that the $86,000.00 amount represented a lower amount of commission than what he had expected. Tr. at 123–24.

Finally, Bowden testified with regard to the ultimate uses of the money Elrod lent him in response to questions from the Court. Bowden stated, at the time of the Elrod loan, he had $12,000.00 in monthly expenses, which included mortgage payments and loan payments on three cars.

---

**2.** In his letter to Mr. and Mrs. Elrod dated April 29, 2003, Bowden, in pertinent part, wrote as follows: "Please accept the only $5000.00 I have at this moment as partial payment. My intentions are to continue to make payments as my closings occur until the full 30k is paid." Pl.Ex. 14.

Tr. at 134. Bowden also testified that "[o]n a personal use basis the end of 2002 was a pretty hectic time, and I had planned a vacation, for lack of a better term, at the first of the year. I'm sure that some of the funds went there as well. Personal debt, personal use." Tr. at 135.

## II.

### ARGUMENTS

Elrod, by counsel, argues that he has met his burden of proof with regard to the allegations that Bowden obtained money by false pretenses, a false representation, or actual fraud, and that he obtained money by use of a written statement that was materially false as to Bowden's financial condition on which Elrod reasonably relied and that Bowden made with the intent to deceive under Sections 523(a)(2)(A) and (B) of the Bankruptcy Code. As to the allegations under Section 523(a)(2)(A), Elrod argues that four discrepancies surfaced in Bowden's testimony that support the conclusion that the loan was predicated by either false pretenses, a false representation, or actual fraud. The first discrepancy, he argues, is the purpose of the loan. Elrod points to the fact that while he testified that Bowden told him that the loan was for a third-party transaction, Bowden testified that he told Elrod that it was for personal obligations and admitted that a portion of the funds was used for a vacation. To this extent, Elrod argues that Bowden knew he sought safe, low-to-no risk investments and took advantage of the situation by fabricating the third-party transaction story to entice Elrod to make the loan. Tr. at 140–41.

The second discrepancy, according to Elrod, concerns the issue of whether Bowden represented that he owned the properties and offered the properties as collateral or whether the source of repayment was solely the proceeds from transactions con-cerning those properties. Elrod contends that he was under the former impression and was never given any indication by Bowden that he meant otherwise. Elrod asserts that Bowden also contradicted himself by failing to apprise Elrod of the fact that he had disclaimed his interest in the properties at issue. Tr. at 141–42.

Whether a deed of trust was ever asked for or offered is Elrod's third point of discrepancy. While the parties agree that no deed of trust was offered, Elrod argues that he did ask Bowden for a deed of trust but that he relied on Bowden when he responded that none was necessary. Elrod reiterates the cautious nature in which he makes investments, in comparison with Bowden's testimony that Elrod "should have known better" as a result of his prior real estate investment transactions. Elrod contrasts himself with Bowden, highlighting the fact that is an experienced realtor who is or should be knowledgeable about the necessity of deeds of trust. Elrod argues that Bowden dismissed his request for a deed of trust because Bowden knew he did not have the authority to grant one since he had disclaimed his interest in the property prior to approaching Elrod for the loan. Tr. at 143–44.

Elrod also offers a fourth discrepancy in support of his argument, namely, the notion that Bowden was in financial distress. In contrast to Elrod's testimony that Bowden never mentioned that he was suffering financial problems, Bowden stated that he made general statements to that effect but never offered further specifics to Elrod. Elrod asserts that, because of Bowden's tax liens and the judgments taken against him, more detail as to his financial situation should have been disclosed. Tr. at 144–45. Elrod argues that such disclosure was incumbent upon Bowden in the totality of the circumstances, given the other discrepancies, the context of their relation-

ship, their course of dealing, and the fact that Bowden knew that Elrod was only interested in safe investments. Tr. at 146.

Elrod asserts that he reasonably relied upon Bowden's representations with respect to the purpose of the loan based upon their course of dealing over the several years prior to the loan. Elrod argues that his reliance was also reasonable since the specific representation that the purpose of the loan was for a third-party transaction and that the money was needed quickly in order for the deal to be consummated. Tr. at 148.

Elrod also argues that the burden of proof was met with regard to his allegations under Section 523(a)(2)(B). Elrod offers that a materially false written statement regarding Bowden's financial condition on which Elrod reasonably relied and which was made by Bowden with the intent to deceive is evidenced in one sentence in the Note: "The indebtedness evidenced by this note is secured by the proceeds to be distributed from any transaction concerning the maker's residence, located at 582 West Ocean View Avenue, Norfolk, Virginia, 23503, or any proceeds resulting from the property located at 1000 East Ocean View Avenue, Norfolk, Virginia." Tr. at 149; *see also* Pl.Ex. 10. Elrod argues that the insertion of the language "the maker's residence" not only represents a false statement with regard to property ownership and thus financial condition that was used to deceive Elrod, but also supports the false pretenses argument under Section 523(a)(2)(A). Tr. at 150–52. The fact that Bowden disclaimed his inheritance interest in that property just two weeks prior to the loan is evidence that Bowden made a false statement, according to Elrod. Tr. at 152.

Elrod also takes issue with the language "or any proceeds resulting from the property located at 1000 East Ocean View Ave-

nue." Elrod argues that the more general statement "from the property" implies that Bowden had an ownership interest in that property, just as he had implied an ownership interest in 582 West Ocean View Avenue by referring to it as his residence. Tr. at 152.

Elrod also offered argument with regard to the proper interest rate on the Note, in the event that the Court rules in his favor. Elrod points to Virginia Code Annotated § 8.3A–112, which addresses interest rates for negotiable instruments. Elrod asserts that, while the Note does not make any reference to interest, it does reference a "repayment rate," which he argues is at the rate of sixty (60) percent. Elrod contends that his argument is supported by the fact that when Bowden did not repay the Note in February, Bowden offered to increase the repayment rate to $30,000.00. Tr. at 152–53. Therefore, while "the word 'interest' was[ ][not] used ... nevertheless that is essentially an interest rate." Tr. at 153. Elrod quotes the portion of Virginia Code § 8.3A–112 that states "the amount or rate of interest may be stated or described in the instrument in any manner and may require reference to information not contained in the instrument." Elrod posits that provision for repayment of $27,500.00 on a $25,000.00 loan is supported by such "information" not found within the Note. Tr. at 153. At an interest rate of 60 percent, Elrod computes his damages as $48,892.67. Tr. at 154.

To the extent that the Court would not find that a 60 percent interest rate was provided for in the Note, Elrod alternatively asks the Court to find that the appropriate interest rate is the judgment rate of interest provided for under Virginia law pursuant to Virginia Code § 8.3A–112, which he states is nine (9) percent. At a nine percent interest rate, Elrod asserts that his damages would be $24,602.65. Tr.

at 154. Regardless of whether the Court finds that Elrod is entitled to interest or not, Elrod maintains that he is still entitled to recover his attorney fees, which are provided for in the Note at a rate of twenty (20) percent. Tr. at 154–55.

Bowden, by counsel, argues that Elrod made it known to Bowden that he was receptive to investment opportunities. When Bowden presented him with two of these opportunities prior to the instant transaction, Elrod viewed the properties involved, executed notes, and procured deeds of trust. Bowden contrasts these actions with those Elrod took in the transaction at issue. He argues that he told Elrod that he needed money for personal use and, because he had contracts pending that were due to close in the sixty-day time period, he was relying on those prospective commissions to repay Elrod. Elrod did not make any inquiry as to the property involved in the loan transaction with Bowden, nor did Elrod inquire as to any other details about the loan or why it was needed. Instead, Elrod made the loan based upon the parties' record of dealing with each other. Tr. at 157–58, 160.

Bowden contrasts the reasonable reliance standard with that of justifiable reliance as announced by the Supreme Court in *Field v. Mans*, 516 U.S. 59, 116 S.Ct. 437, 133 L.Ed.2d 351 (1995), in which the Supreme Court stated that the qualities and the characteristics of the particular plaintiff involved must be examined to determine whether justifiable reliance resulted. Bowden quotes:

> Justification is a matter of the qualities and characteristics of the particular plaintiff and the circumstances of the particular case, rather than [of] the application of a community standard of conduct in all cases.... Justifiability is not without some limits however.... A person is required to use his senses and

cannot recover if he blindly relies upon a misrepresentation, the falsity of which would be patent to him if he had utilized his opportunity to make a cursory examination or investigation.... Thus, a defect that any experienced horseman would at once recognize at first glance may not be patent to a person who has no experience with horses.... A missing eye in a sound horse is one thing, long teeth in a young one, perhaps another.

Tr. at 159–60 (quoting *Field*, 516 U.S. at 71, 116 S.Ct. 437).

Bowden argues that Elrod's employment as a commander in the Navy intelligence community, as well as the fact that Elrod had twice previously participated in properly documented deals set up by Bowden, as proof that Elrod had the requisite knowledge such that he should have followed up and asked additional questions of Bowden when the loan was made. It is for these same reasons that Elrod should have been aware of the significance of the language contained within the Note. Tr. at 159. Additionally, Bowden offers that Elrod did not question the circumstances regarding why Bowden needed the money because there was a large profit to be gained within a short time frame and again, because of the parties' past relationship. Tr. at 160.

Bowden does not dispute that Elrod has suffered a loss as a result of the loan transaction, nor does Bowden disagree that Elrod has suffered harm as a result of Bowden's actions. Tr. at 161. Bowden does dispute, however, the issue of whether there was a fraudulent misrepresentation. Bowden contends that he sought the loan for personal reasons and that Elrod was induced to lend the money based on the large return that was promised. Tr. at 161–62. With respect to Bowden's ability to repay, he points to the sizeable real

estate commissions that he earned during the years immediately preceding the loan as proof that he believed he had the ability to repay Elrod, and that even if the real estate transaction did not occur, he had the ability to repay the loan from other sources. To bolster this argument, Bowden highlights the fact that he did eventually repay $10,000.00 on the Note and that this money came from transactions other than the one(s) he was originally relying on to pay Elrod. Tr. at 163.

With respect to the allegations under Section 523(a)(2)(B), Bowden argues that the Note does not in any way represent any property ownership, but instead, merely references proceeds from transactions affecting those properties. While acknowledging that the reasonable reliance standard under Section 523(a)(2)(B) is higher than that of justifiable reliance under Section 523(a)(2)(A), Bowden argues that, even if the Court finds that the language of the Note constituted a written financial statement, Elrod would still have the burden of proving that he acted as a prudent man in extending the loan. Tr. at 163–64. Bowden argues that the courts generally view written financial statements under Section 523(a)(2)(B) narrowly, citing lists of assets and liabilities, income and expense statements, and numerical representations as examples of acceptable written financial statements. A source of repayment does not meet the criteria for a written financial representation according to Bowden. Tr. at 167–68.

As to whether Bowden intended to deceive, Bowden asserts that this inquiry becomes necessary only if the Court finds that he did make a written representation as to his financial condition. Bowden offers that he did not intend or seek to deceive anyone with regard to who owned the properties, including Elrod. Bowden reiterated that he filed an affidavit with regard to his mother's heirs with the Circuit Court for the City of Norfolk, Virginia, confirming his status. Bowden also points to Ms. Ferguson's testimony that Bowden did what was necessary to be able to sell the property with a clear title. Tr. at 164–65.

As to the issue of interest on the loan, Bowden argues that the Note does not provide for interest, but instead, that the Note provides for a return for a fixed period of time. Even if the Court finds that interest should be assessed, Bowden contends that the proper rate should be the judgment rate of interest in Virginia, which Bowden agrees is nine percent. Tr. at 166.

Bowden does note, however, that the attorney fee calculation should be based on the principal balance alone, and not on the amount of the Note plus the accrued interest. Bowden takes issue, however, with the fact that Elrod is requesting attorney fees in the amount of twenty percent, arguing that in federal court in general, and Bankruptcy Court in particular, even reasonable attorney fees are to be proven, and thus requests that the Court take evidence on this issue. Tr. at 166–67. Finally, Bowden requests, if the Court finds the debt to be dischargeable, an award of his attorney fees pursuant to Section 523(d) and permission to submit evidence of such fees. Tr. at 167.

In his rebuttal argument, Elrod argues, with respect to the issue of property ownership, that he did act in a reasonable and cautious manner by asking Bowden about the necessity for a deed of trust, to which Bowden responded that Elrod did not need a deed of trust. Elrod also asserts that he also inquired of Bowden as to his assurances of repayment, which Bowden stated would be given by way of the Note being submitted to Advance Title to ensure that Elrod was paid out of the property trans-

action proceeds. Elrod argues that the property ownership and repayment assurances all fall into the broader totality of the circumstances that surrounds this transaction with regard to the allegations of fraud under Section 523(a)(2)(A). Tr. at 172–73.

Elrod also contends that the loan at issue is distinguishable from the previous loans arranged by Bowden in that this loan, although presented in the context that it would enable a third-party transaction, was not a third-party loan. Rather, the loan was to Bowden himself and was purportedly supported by Bowden's collateral. Elrod argues that, because of the unique nature of this transaction in contrast with the other two loan transactions as well as short time frame in which the discussions and transaction occurred, the due diligence expected and required of him would not be the same as in the other transactions. Tr. at 174–75.

Elrod also responded to Bowden's statements as to the expectation of repayment. Elrod contends that this is not part of the necessary analysis before the Court. To the extent that the Court should consider such, Elrod offers that any expectation Bowden had of repaying Elrod was belied by the enormous outstanding debts Bowden owed. Tr. at 175.

Elrod addressed Bowden's contention that Elrod sought only a quick, high return and therefore was interested in high risk loans. Elrod points to the previous transactions arranged by Bowden in which Elrod earned only a small rate of return on the loans, thus exhibiting a preference for low risk transactions. Tr. at 176.

Finally, Elrod rebutted Bowden's contentions with regard to attorney fees. Elrod argues that Section 523(d) applies only in the case of consumer debt and if the case was not substantially justified. Elrod asserts that the loan in the instant matter is not for consumer debt. He also contends that the difficult nature of the case contributes to a finding that he was substantially justified in bringing the case. Tr. at 176.

## III.

## CONCLUSIONS OF LAW

▮ One of the most important benefits of the Bankruptcy Code is its ability to offer debtors a fresh start. This concept of a fresh start demands that courts construe exceptions to discharge narrowly against the objecting creditor and in favor of the debtor. *Gleason v. Thaw*, 236 U.S. 558, 561–62, 35 S.Ct. 287, 59 L.Ed. 717 (1915); *Foley & Lardner v. Biondo (In re Biondo)*, 180 F.3d 126, 130 (4th Cir.1999) (citing *Century 21 Balfour Real Estate v. Menna (In re Menna)*, 16 F.3d 7, 9 (1st Cir.1994)); *Rezin v. Barr (In re Barr)*, 194 B.R. 1009, 1016 (Bankr.N.D.Ill.1996) (citing *Mayer v. Spanel Int'l Ltd.*, 51 F.3d 670, 674 (7th Cir.1995)). Courts balance this belief in a fresh start with the principle that "perpetrators· of fraud are not allowed to hide behind the skirts of the Bankruptcy Code." *In re Biondo*, 180 F.3d at 130 (citing *Cohen v. de la Cruz*, 523 U.S. 213, 217, 118 S.Ct. 1212, 140 L.Ed.2d 341 (1998)).

The exceptions at issue in the instant case arise under 11 U.S.C. § 523, which makes debts nondischargeable:

> (2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—
>
> > (A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition;
> >
> > (B) use of a statement in writing—
> >
> > > (i) that is materially false;

(ii) respecting the debtor's or an insider's financial condition;

(iii) on which the creditor to whom the debtor is liable for such money, property, or services, or credit reasonably relied; and

(iv) that the debtor caused to be made or published with intent to deceive. . . .

11 U.S.C. §§ 523(a)(2)(A)-(B) (2004).

Under Bankruptcy Rule 4005, the plaintiff has the burden of proving that a debt is nondischargeable in bankruptcy. Further, Section 523(a) requires that the plaintiff prove nondischargeability by a preponderance of the evidence. *Grogan v. Garner*, 498 U.S. 279, 287–88, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991); *Farouki v. Emirates Bank Int'l, Ltd.*, 14 F.3d 244, 249 (4th Cir.1994); *Combs v. Richardson*, 838 F.2d 112, 116 (4th Cir.1988); *Whitson v. Middleton (In re Middleton)*, 100 B.R. 814, 818 (Bankr.E.D.Va.1988). Therefore, Elrod must prove by a preponderance of the evidence whether either of these provisions of Section 523 applies to the case at issue.

### A. § 523(a)(2)(A)

*False Pretenses, False Representation, or Actual Fraud*

Elrod asserts that Bowden's debt is nondischargeable as a debt arising from false pretenses, false representation, or actual fraud. At the outset, it should be noted that it is undisputed that Bowden did receive a loan from Elrod wherein monies were transferred by Elrod to Bowden, thus satisfying the component of Section

523(a)(2) that requires a showing that the debtor received either "money, property, services, or an extension, renewal, or refinancing of credit" under both Section 523(a)(2)(A) and Section 523(a)(2)(B).

As this Court has previously held, to make a debt nondischargeable under § 523(a)(2)(A), the plaintiff must prove the following elements:

(1) That the debtor made a representation;

(2) That at the time the representation was made, the debtor knew the representation was false;

(3) That the debtor made the false representation with the intention of deceiving the creditor;

(4) That the creditor relied on such representation; and

(5) That the creditor sustained the alleged loss and damage as the proximate result of the false representation.

*Fowler v. Garey (In re Garey)*, 258 B.R. 356, 360–61 (Bankr.E.D.Va.2000); *Parker v. Grant (In re Grant)*, 237 B.R. 97, 112 (Bankr.E.D.Va.1999); *Spinoso v. Heilman (In re Heilman)*, 241 B.R. 137, 149 (Bankr. D.Md.1999); *Hecht's v. Valdes (In re Valdes)*, 188 B.R. 533, 535 (Bankr.D.Md. 1995); *Clarkson v. Elibuyuk (In re Elibuyuk)*, 163 B.R. 75, 76 (Bankr.E.D.Va. 1993).[3]

### 1. Did Bowden Make a Misrepresentation?

Representations are either express or implied. "A false representation

---

**3.** As these cases illustrate and most recently *Foley & Lardner v. Biondo (In re Biondo)*, 180 F.3d 126, 130 (4th Cir.1999), demonstrates, the Fourth Circuit analyzes § 523(a)(2)(A) by strictly focusing on misrepresentations. While the Seventh Circuit and the Sixth Circuit Bankruptcy Appellate Panel adopt a

broader definition of § 523(a)(2)(A), such definition includes general tricks and deceit rather than only misrepresentations. *See McClellan v. Cantrell*, 217 F.3d 890, 893 (7th Cir. 2000); *Mellon Bank, N.A. v. Vitanovich (In re Vitanovich)*, 259 B.R. 873, 877 (6th Cir. BAP 2001).

is an express misrepresentation, while a false pretense refers to an implied misrepresentation or 'conduct intended to create and foster a false impression.'" *Nat'l Bank of N. Am. v. Newmark (In re Newmark)*, 20 B.R. 842, 854 (Bankr.E.D.N.Y. 1982) (quoting *H.C. Prange Co. v. Schnore (In re Schnore)*, 13 B.R. 249, 251 (Bankr. W.D.Wis.1981)). As this Court held in *Parker v. Grant (In re Grant)*, 237 B.R. 97, 113 (Bankr.E.D.Va.1999), and *Household Finance Corp. v. Kahler (In re Kahler)*, 187 B.R. 508, 512 (Bankr.E.D.Va. 1995), § 523(a)(2)(A) does not require any overt misrepresentation; this Court may imply such a misrepresentation from the debtor's silence.

▇ The testimony by Elrod and Bowden is divergent on Bowden's representation as to why he needed a loan from Elrod. According to Elrod, Bowden represented that the purpose of the loan was to complete a third-party real estate transaction. Conversely, Bowden testified that he told Elrod the money was needed for "personal debt, personal use." Bowden elaborated that he "made it clear" to Elrod that he was in "personal trouble," but stated that he did not discuss with Elrod the severity of his financial problems nor did Elrod make any such inquiries. In later questioning, Bowden admitted that the money Elrod lent him was used to pay mortgage and car loan payments, as well as for a vacation that he had planned at the end of 2002.

This Court has previously held that a misrepresentation occurs when funds are entrusted to a debtor for a specific purpose, and the debtor has no intention of using the money for that purpose. *KMK Factoring, L.L.C. v. McKnew (In re McKnew)*, 270 B.R. 593, 619 (Bankr. E.D.Va.2001) (citing *Marineau v. Slonim*, No. Civ. A. 94–047, 1994 WL 661143, at *2 (W.D.Va. Nov. 10, 1994); *Fensick v. Segala (In re Segala)*, 133 B.R. 261, 264 (Bankr. D.Mass.1991) ("If funds are deemed to have been entrusted to the debtor for a specific purpose, the debtor is regarded as impliedly representing his intention to use the funds accordingly."); *Miller v. Blagaich (In re Blagaich)*, 67 B.R. 375, 377 (Bankr.S.D.Fla.1986)); *see also City Nat'l Bank of Fla. v. Sheridan (In re Sheridan)*, 57 F.3d 627, 635 (7th Cir.1995); *Leverage Leasing Corp. v. Reitz (In re Reitz)*, 69 B.R. 192, 196 (N.D.Ill.1986).

The Court finds that Elrod's testimony as to what Bowden represented the purpose of the loan to be as the more credible testimony for a number of reasons. The relationship between the parties prior to the loan appears to the Court to have been more of a business relationship rather than a personal one. The parties were originally introduced when Bowden served as Elrod's real estate agent in 1995. Elrod testified that he viewed Bowden as his realtor, whereas Bowden viewed himself as a "personal friend" to Elrod and his wife, stating that the Elrods were "more personal clients than the average people." However, the facts fall short of sustaining Bowden's opinion of their relationship. The two parties had no more than occasional contact between 1995 and 2002. Elrod was not familiar with Bowden's financial status, and he testified that had he knew about the true circumstances surrounding the loan, his decision as to whether to lend the money to Bowden would have been affected.

It simply does not appear to this Court that Elrod and Bowden had a relationship of such type that Bowden could request a $25,000.00 loan from Elrod for personal obligations and that Elrod would in turn make the loan without substantial inquiry into the reason(s) Bowden needed the funds. This conclusion is also bolstered by the fact that Elrod appears to be a pru-

dent investor and not of extraordinary means such that a $25,000.00 loan would not have at least some impact on him and his wife's financial well-being, given Elrod's testimony that he sought safe, low-to-no risk investments.

Given the nature of their relationship, the conservatism of Elrod, and the significant amount of the loan, the Court does not believe Elrod would have lent the proceeds to Bowden without substantial additional inquiry and due diligence if the represented use of the loan by Bowden was the vagaries of "I needed personal funds for personal debt and personal use." Tr. at 40. There is simply no corroborating evidence in the record that would persuade this Court that Elrod would have made this loan if he had been told by Bowden it was to pay personal debt and expenses. Rather, the Court believes that Bowden, confounded by his admitted necessity of securing at least $12,000.00 each month to pay his lifestyle expenses amidst his substantial financial troubles, told Elrod the intended use he believed was likely to provoke the making of the much-needed loan, a purpose which Bowden knew was fictitious. While Bowden was candid with the Court with regard to how he actually used the funds, the Court finds that Bowden made a misrepresentation to Elrod that the purpose of the loan was to complete a third-party transaction, when in fact that was not the purpose for which Bowden actually sought the loan, nor was it the use that Bowden intended to make of the loan proceeds.

Elrod asserts that Bowden was under a duty to disclose more information regarding his financial condition and that such information should have been disclosed in the totality of circumstances surrounding the making of the loan. The Court agrees that the failure to disclose information re-

garding his financial condition was a misrepresentation by Bowden, but only to the extent that the failure to so disclose was part and parcel of the misrepresentation as to the purpose of the loan. The Court makes no finding at this stage regarding whether such statements constitute ones regarding financial condition under Section 523(a)(2)(B).[4]

Elrod also alleges that Bowden made a misrepresentation under Section 523(a)(2)(A) with regard to whether he owned the two properties referred to in the Note. Elrod testified that he would not have made the loan unless he was assured of repayment by having a security interest in specific collateral, as he had obtained with the other two loans that Bowden arranged for him. Elrod also pointed to Bowden's previous statements in which he referenced the 582 West Ocean View Avenue property as his residence, and to the business card given to him by Bowden for Coastal Realty Group that notes the realty company's address as 1000 East Ocean View Avenue. Bowden testified that the references in the Note refer only to the proceeds from transactions concerning those properties and were never meant to serve as a representation of his ownership of the properties. Bowden confirmed, however, that he never affirmatively stated to Elrod that he did not have any ownership interest in either 582 West Ocean View Avenue or the 1000 East Ocean View Avenue.

■ The Court need not reach a conclusion as to whether the statements regarding the two properties constitute (1) a statement of property ownership, and if they do, (2) whether Bowden made a misrepresentation under Section 523(a)(2)(A). The Fourth Circuit Court of Appeals has

4. *See* section III.B.1, *infra*.

spoken to the issue of property ownership in *Engler v. Van Steinburg (In re Van Steinburg)*, 744 F.2d 1060 (4th Cir.1984), and teaches that assertions as to property ownership may constitute statements regarding financial condition, such that those statements must be made in writing pursuant to Section 523(a)(2)(B) in order to constitute a ground to deny discharge. *In re Van Steinburg*, 744 F.2d at 1061 (citing *Blackwell v. Dabney*, 702 F.2d 490 (4th Cir.1983)). Thus, such allegations shall be addressed in the appropriate section below.

Elrod also raises as an additional misrepresentation by Bowden the issue of whether a deed of trust was necessary. Elrod states that he specifically asked about the need for a deed of trust and was told that it was not necessary. Bowden confirmed that there was no deed of trust associated with the loan because the loan was not secured by the property itself but rather the proceeds from transactions concerning those properties. Bowden affirmed, however, that the Note was sent to the title company that regularly performs closings for him and that he instructed the title company to pay Elrod out of any proceeds received from transactions regarding the two properties.

The Court finds that the evidence is insufficient to conclude that a misrepresentation was made as to the need for a deed of trust in this instance. Factually, what appears to have occurred is that Bowden represented that he intended to pay Elrod from commission proceeds regarding the two properties and not that he was securing the loan with the properties themselves, thus making a deed of trust unnecessary. As such, no misrepresentation was made by Bowden as to the necessity for a deed of trust.[5] To be sure, Elrod may not have necessarily understood the source from which Bowden would repay him. Nonetheless, to achieve his intention of repaying Elrod from commission proceeds from one or both of the properties, Bowden took the necessary steps for this to occur by sending the

5. Black's Law Dictionary defines "representation" as "a presentation of fact—either by words or by conduct—made to induce someone to act, especially to enter into a contract ..." BLACK'S LAW DICTIONARY (8th ed.2004). Further, the definition for a *mis*representation includes that of "an assertion that does not accord with the facts." *Id.* Thus, it follows that a representation must be one of fact and not of the kind based in law. *See also Field v. Mans*, 516 U.S. 59, 70, 116 S.Ct. 437, 133 L.Ed.2d 351 (1995) (discussing the standard of justifiable reliance and citing with favor an excerpt from the Restatement (Second) of Torts that "a person is justified in relying on a representation of *fact*") (emphasis added); *Arnlund v. Smith*, 210 F.Supp.2d 755, 770 (E.D.Va.2002) (citing the elements of actual fraud in Virginia and including among them the requirement that the false representation must be one of "material *fact*"); *Prospect Dev. Co. v. Bershader*, 258 Va. 75, 85, 515 S.E.2d 291, 297 (Va.1999) (same).

The issue of whether Bowden's representation as to whether a deed of trust was necessary may be, at best, a representation mixed with law and fact, as the question of whether or not a deed of trust is needed could ultimately be viewed as a legal question, given the legal rights and responsibilities that arise from such a document. Thus, such statements by Bowden regarding the deed of trust may not even rise to the level of being a "representation" for the purpose of this analysis. However, given that Elrod has specifically alleged that these statements are misrepresentations by Bowden, and Bowden's failure to argue that the statements are not ones at least mixed with law and fact, the Court has undertaken its analysis from the standpoint that the statements were, in fact, representations of fact. Were the statements found to ones mixed with law and fact, the Court would find that such statements do not meet the basic requirement that a representation was made in determining whether a misrepresentation had occurred.

promissory note to Debra Ferguson at Advance Title and Abstract.[6]

### 2. Did Bowden Know the Representation was False?

For a debt to be nondischargeable, the plaintiff must prove the debtor knew or should have known that the representation was false when made. *KMK Factoring, L.L.C. v. McKnew (In re McKnew)*, 270 B.R. 593, 619 (Bankr. E.D.Va.2001); *Parker v. Grant (In re Grant)*, 237 B.R. 97, 115 (Bankr.E.D.Va. 1999) (citing *Berk v. Stewart (In re Stewart)*, 10 B.R. 214, 217 (Bankr.C.D.Cal. 1981); *Koma v. Brooks (In re Brooks)*, 4 B.R. 237, 238 (Bankr.S.D.Fla.1980)).

It follows from the above analysis that, because Bowden did not intend to use the money to complete a third-party transaction, but rather, to use the money to fulfill personal obligations, that Bowden knew that the representation he made to Elrod as to the purpose of the loan was false. Also contributing to this conclusion is the time frame surrounding the events at issue. Bowden contacted Elrod approximately five to seven days prior to the actual loan being made on December 23, 2002. The same day, the Note was signed and Elrod remitted two checks to Bowden for the total $25,000.00 amount. Bowden's testimony was that he had significant debt service payments due each month of approximately $12,000.00, and that he had a

vacation planned for the end of 2002. The Court finds that Bowden knew the uses to which he would put the money, given the immediate need for the funds, and that he falsely represented such uses to Elrod. There is no evidence in this record that Bowden at any time proximate to the making of this loan by Elrod was involved in any third-party real estate transaction or investment that necessitated the usage of the loan proceeds. Therefore, the Court concludes that the second element of nondischargeability under Section 523(a)(2)(A) is satisfied.

### 3. Did Bowden Intend to Deceive?

"Because direct proof of intent (i.e., the debtor's state of mind) is nearly impossible to obtain, the creditor may present evidence of the surrounding circumstances from which intent may be inferred." *Universal Bank, N.A. v. Grause (In re Grause)*, 245 B.R. 95, 99 (8th Cir. BAP 2000) (quoting *Caspers v. Van Horne (In re Van Horne)*, 823 F.2d 1285, 1287 (8th Cir.1987)); *see also Marunaka Dainichi Co. v. Yamada (In re Yamada)*, 197 B.R. 37, 40 (Bankr.E.D.Va.1996); *Western Union Corp. v. Ketaner (In re Ketaner)*, 154 B.R. 459, 465 (Bankr.E.D.Va.1992). "An intent to deceive may be inferred from a false representation which the debtor should have known would induce a creditor." *Parker v. Grant (In re Grant)*, 237 B.R. 97, 115 (Bankr.E.D.Va.1999) (quoting

---

6. Even if Bowden's representation was found to be a *mis*representation and was found to be one that Bowden knew was false (the next element of this analysis), this Court would not conclude that Bowden intended to deceive Elrod (the third element of this analysis). The evidence before the Court is that Bowden was relying on the commission income from transactions involving, at a minimum, the property located at 582 West Ocean View Avenue to repay Elrod. There is no evidence in the record to suggest that Bowden had

other possible sources of repayment, especially considering his financial circumstances during that period of time, or that Bowden ever intended to give Elrod a deed of trust on one or both of the properties Therefore, any representation by Bowden with regard whether Elrod needed a deed of trust was not made with an intent to deceive, as the Court finds that any such statements were not made for the purpose of inducing Elrod to rely upon them.

*Bebber v. J.M. Westall & Co. (In re Bebber)*, 192 B.R. 120, 124 (Bankr.W.D.N.C. 1995)). This Court has held if the " 'debtor recklessly makes false representations that he should know will induce another to rely thereon, intent to deceive may be inferred for purposes of § 523(a)(2)(A).' " *Id.* (citing *Household Fin. Corp. v. Kahler (In re Kahler)*, 187 B.R. 508, 513 (Bankr. E.D.Va.1995)). The recklessness " 'must exceed negligence and rise to the level of reckless disregard for the truth.' " *Id.* (quoting *In re Kahler*, 187 B.R. at 513). Further, "intent to defraud must exist at the time the debtor made the representations; any subsequent conduct that is contrary to the original representation does not necessarily indicate that the original representation was false." *Id.* (citing *Mann v. Boese (In re Boese)*, 8 B.R. 660, 662 (Bankr.D.S.D.1981)). Finally, once a creditor has provided circumstantial evidence giving rise to this intent, a debtor cannot overcome the inference by making unsupported assertions of honest intent. *Marunaka Dainichi Co. v. Yamada (In re Yamada)*, 197 B.R. 37, 40 (Bankr.E.D.Va. 1996); *Western Union Corp. v. Ketaner (In re Ketaner)*, 154 B.R. 459, 465 (Bankr. E.D.Va.1992).

The Court finds that Elrod has sustained his burden of proof as to Bowden's intent to deceive. Bowden had previously arranged two investment opportunities for Elrod and was aware that Elrod was interested in safe, low-to-no risk investments. Bowden admitted to the Court his state of financial distress and the events that caused his financial problems, including his mother's death, the failure of certain real estate contracts to close as scheduled, and a fairly large debt service due each month. Thus, it can be inferred that he knew that Elrod was more likely to lend him $25,000.00 to enable him to consummate a third-party real estate transac-

tion than if Bowden had represented his true state of financial distress and his plans for the loan money (i.e., to pay personal debt and to go on a vacation), as, arguably, the former would be a much safer "investment" than the latter. Bowden knew Elrod's preference for safe investments, and by painting a picture of such in order to secure his own loan, Bowden made a false representation that he knew would induce Elrod to lend him the $25,000.00, especially in light of the return on investment of $2,500.00 that Elrod would earn over a period of just two months.

Also contributing to this conclusion is the rapid nature of the transaction, in that Bowden represented to Elrod that he needed the money quickly in order to close a third-party real estate transaction. By representing that the purpose of the loan was for a real estate transaction that needed to be consummated in relatively short order, Bowden further intended to deceive Elrod.

While the Court is mindful of the fact that Bowden apparently expected one or more real estate transactions to close in the two-month period in which he was to repay Elrod, that fact does not overcome the circumstantial evidence submitted by Elrod that Bowden did intend to deceive him. Therefore, the Court concludes that Bowden possessed the requisite intent of deceiving Elrod as to the purpose of the loan, and the third element of Section 523(a)(2)(A) is satisfied.

### 4. Did Elrod Justifiably Rely on the Representations?

The fourth element of fraud requires that Elrod prove that he relied on Bowden's representations. The Supreme Court has held that a plaintiff must prove that he justifiably relied on the debtor's representations in order to succeed under Section 523(a)(2)(A). *Field v. Mans*, 516

U.S. 59, 73–74, 116 S.Ct. 437, 133 L.Ed.2d 351 (1995). Under this standard, "[j]ustification is a matter of the qualities and characteristics of the particular plaintiff, and the circumstances of the particular case, rather than of the application of a community standard of conduct to all cases." *Id.* at 71, 116 S.Ct. 437.[7] In several common-law states adopting this standard, it was interpreted as imposing no duty to investigate, absent factors arousing suspicion. *Parker v. Grant (In re Grant),* 237 B.R. 97, 116 (Bankr.E.D.Va.1999) (citing *Field,* 516 U.S. at 73 n. 12, 116 S.Ct. 437; *Franklin v. Nunnelley,* 242 Ala. 87, 89, 5 So.2d 99, 101 (Ala.1941)). For example, "[a] buyer's reliance on this factual representation [seller's statement the land is free of encumbrances] is justifiable, even if he could have 'walked across the street to the office of the register of deeds in the courthouse' and easily have learned of an unsatisfied mortgage." *Field,* 516 U.S. at 70, 116 S.Ct. 437 (quoting Restatement (Second) of Torts § 540 (1976) (Illustration 1)).

■■■■■ This definition of reliance is not without limits, however. As this Court has previously held, "a creditor 'cannot recover if he blindly relies upon a misrepresentation the falsity of which would be patent to him if he had utilized his opportunity to make a cursory examination or investigation.'" *In re Grant,* 237 B.R. at 116 (citing *Field,* 516 U.S. at 70, 116 S.Ct. 437). Thus, if one has a warning of deception, one needs to investigate on his own. *Id.*

■■■■ The evidence does not reveal any instances during the negotiations leading up the instant transaction or during the transaction itself that would have indicated to a plaintiff with Elrod's qualities and characteristics any suspicions regarding Bowden's stated purpose for the loan. Elrod is a reasonably intelligent individual, as evidenced by his employment and position in Intelligence with the United States Navy and by the Court's observation of his testimony. As previously alluded to, he appears to be a prudent investor who does not, by his nature, seek out risky investments. Elrod alerted Bowden that these were the only types of investments in which he was interested. Bowden did arrange two previous real estate transactions for Elrod that transacted as expected and which provided him with a small but safe return on investment. Thus, knowing that Bowden knew his preferences for a safe, low-to-no risk transaction, and having been presented with such a transaction, Elrod relied on Bowden's representation as to the purpose of the loan.

Elrod credibly stated in his testimony that, had he known the true purpose for which Bowden sought the loan, that fact would have made a definite impact on his decision to lend the money. Elrod specifically testified that Bowden never alluded to any financial distress, but instead represented that the sole purpose for the loan was to enable him to consummate a third-party real estate transaction.

The timing issues surrounding the transaction would not have given rise to any suspicions by a plaintiff such as Elrod.

---

7. The justifiable reliance standard, in which the focus is on whether the falsity of the representation should have been "readily apparent" to the person to whom it was made, can be contrasted with the more stringent standard of reasonable reliance, which focuses on whether the reliance was reasonable under the "hypothetical average person" stan-

dard. *Field,* 516 U.S. at 71–75, 116 S.Ct. 437; *In re Grant,* 237 B.R. at 116 n. 32 (citing 4 Collier on Bankruptcy ¶ 523.08[1][d] (15th ed.)); *see also Mester v. Brevard (In re Brevard),* 200 B.R. 836, 845 (Bankr.E.D.Va. 1996). The reasonable reliance standard is discussed in more detail in Section III.B.2, *infra.*

The situation as presented by Bowden was that he needed a loan "in short order" to consummate a third-party real estate transaction, and that he would be able to repay the loan within two months, as evidenced by the Note. Even given Elrod's limited experience with real estate transactions, this reasoning was not so far afield as to defy the logic of an individual such as Elrod.

Further, the Court finds that the situation as presented to Elrod by Bowden would not have patently presented any falsities to Elrod by way of a cursory examination or investigation. To be sure, Elrod could have asked for additional documentation regarding the supposed third-party real estate transaction, but given the fact that he had a signed Note, as well as what he believed to be an honest representation by Bowden as to the purpose of the loan, he was under no obligation to so do. No circumstances arose that would have triggered suspicion in Elrod as to a possible misrepresentation by Bowden until after the agreement was signed, the loan made, and Bowden failed to timely repay the loan.

Given the nature of the purpose of the loan as represented by Bowden, the Court finds that Elrod justifiably relied on Bowden's representation. Bowden knew Elrod's investment preferences and presented Elrod with an investment offer that would have been difficult for a like plaintiff to refuse. The addition of the timing element further supports this conclusion. Therefore, the Court finds that the fourth element of fraud has been met in this case.

### 5. Did Elrod's Damages Proximately Result from Bowden's Misrepresentations?

■ The final element of fraud that Elrod must prove is whether his damages were a proximate result of Bowden's misrepresentations. Proximate cause is both (1) causation in fact, "loss suffered by one who justifiably relies upon the trust of the matter misrepresented, if his reliance is a substantial factor in determining the course of conduct that results in his loss;" and (2) legal causation, "if the loss might reasonably be expected to occur from the reliance." *KMK Factoring, L.L.C. v. McKnew (In re McKnew)*, 270 B.R. 593, 622 (Bankr.E.D.Va.2001) (citing Restatement (Second) of Torts §§ 546, 584A (1976)); *see also Britton v. Price (In re Britton)*, 950 F.2d 602, 604 (9th Cir.1991); *Parker v. Grant (In re Grant)*, 237 B.R. 97, 117 (Bankr.E.D.Va.1999); *In re Russell*, 203 B.R. 303, 313 (Bankr.S.D.Cal. 1996).

■ In his closing argument, Bowden does not dispute that Elrod suffered a harm in this instance. It is undisputed that, of the final amount ($30,000.00) Bowden agreed to pay, only $10,000.00 was actually repaid to Elrod by Bowden. Therefore, the Court finds that the first element of proximate cause, that of causation in fact, is clearly met in this case, as Elrod has suffered a loss in fact of $20,000.00.

The remaining question, then, is whether Elrod suffered damages that were legally caused by his justifiable reliance on Bowden's misrepresentations. In this instance, there is a strong correlation between Bowden's misrepresentation of the purpose of the loan and the subsequent loss of money suffered by Elrod. Bowden's misrepresentation to Elrod and Elrod's justifiable reliance thereon caused Elrod to lend Bowden a considerable sum of money that, by Elrod's unrebutted testimony, he would not have lent had he knew the true purpose of the loan. Further, Bowden also states during his closing argument that he does not dispute that Elrod suffered harm as a result of his actions.

The instant case is unlike that of *Kaufman v. Vamvakaris (In re Vamvakaris)*, 197 B.R. 228 (Bankr.E.D.Va.1996), in which the Court found that the loss of the jewelry was not caused by the misrepresentation by the jewelry dealer as to theft insurance coverage, but rather, the loss was caused by the theft itself. *Id.* at 231. This case also bears no similarity to *In re Grant*, wherein this Court found that the plaintiffs failed to show any causal connection between the debtor's misrepresentation of his marital status at the time of leasing a dwelling and the physical damage subsequently done to the leased condominium. *In re Grant*, 237 B.R. at 118–19.

Instead, causation in the instant case is more similar to *In re McKnew*, where this Court held that the debtor removed funds from the plaintiff business and converted the funds for his own personal use and other uses upon a misrepresentation to his business associates as to the amount of salary he was drawing from the business as its manager. *In re McKnew*, 270 B.R. at 618–19, 622. In the latter case, the Court found a direct correlation between the damages (the loss of funds) and the misrepresentation by the debtor. *Id.* at 622. In the instant case, too, this direct correlation exists, as the Court finds that Elrod would not have lent Bowden the funds had he knew the true purpose of the loan. In other words, but for the misrepresentation as to the purpose of the loan, Elrod would not have suffered a loss.

Having satisfied each of the elements required under Section 523(a)(2)(A) of the Bankruptcy Code, the indebtedness to Elrod is declared nondischargeable, after deducting therefrom such credits received by Elrod as a result of the partial payments made by Bowden. Therefore, the Court finds that the amount of the total indebtedness that is nondischargeable is $20,000.00 ($30,000.00 per the subsequent agreement by Bowden, less the $10,000.00 paid in 2003).

### B. § 523(a)(2)(B)

*Materially False Written Statement of Financial Condition*

Elrod also asserts that Bowden's debt is nondischargeable as a debt arising from the use of a materially false written statement of financial condition. As stated above in the analysis under Section 523(a)(2)(A), it is undisputed that Bowden did receive a loan from Elrod, thus satisfying the component of Section 523(a)(2) that requires a showing that the debtor received either "money, property, services, or an extension, renewal, or refinancing of credit."

For a debt to be found nondischargeable under § 523(a)(2)(B), the plaintiff must prove that the debtor, in the course of obtaining money from the plaintiff, used a statement in writing:

(1) That is materially false;

(2) Respecting the debtor's or an insider's financial condition;

(3) On which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied; and

(4) That the debtor caused to be made or published with intent to deceive.

11 U.S.C. § 523(a)(2)(B) (2004). In addition, the Court has also held that a plaintiff must "prove the debtor was under a duty to furnish a financial statement as part of the credit transaction." *Global Express Money Orders, Inc. v. Davis (In re Davis)*, 262 B.R. 673, 679 (Bankr.E.D.Va.2001) (quoting *Southeast Assocs. of Durham v. Jacobe (In re Jacobe)*, 121 B.R. 299, 304 (Bankr.E.D.Va.1990)). This latter element has often been incorporated in the element focusing on whether the creditor reasonably relied on any financial statement.

*See Riggs Nat'l Bank of Washington, D.C. v. Ross (In re Ross)*, 180 B.R. 121, 128 (Bankr.E.D.Va.1994) (quoting *Paterno Imports, Ltd. v. McBee (In re McBee)*, 167 B.R. 827, 830 (Bankr.E.D.Va.1994)).

### 1. Did Bowden Use a Written, Materially False Statement Respecting His Financial Condition?

The Court will address the first two elements with regard to a written financial statement together. A statement regarding the financial condition of the debtor must be in writing pursuant to Section 523(a)(2)(B) for a debt to be declared non-dischargeable under that section. In *Engler v. Van Steinburg (In re Van Steinburg)*, 744 F.2d 1060 (4th Cir.1984), the Fourth Circuit took a broad approach as to what constitutes a statement regarding financial condition. *Id.* at 1060–61. The Court points out that Congress did not speak merely in terms of "financial statements" but rather, "referred to a much broader class of statements—those 'respecting the debtor's financial condition.'" *Id.* at 1061. Therefore, the court held that, while a statement that specific assets are unencumbered is not a "formal financial statement, such as a typical balance sheet or a profit and loss statement," such statement certainly qualifies as a statement of financial condition, since whether assets are encumbered "may be the most significant information about [the debtor's] financial condition." *Id.* at 1060–61.

The Court has defined a materially false statement as "'one that paints a substantially untruthful picture of a financial condition by misrepresenting information of the type which would normally affect the decision to grant credit.'" *In re Ross*, 180 B.R. at 127 (quoting *I.H. Mississippi Valley Credit Union v. O'Connor (In re O'Connor)*, 149 B.R. 802, 807 (Bankr. E.D.Va.1993)). Such statements that have previously been found to constitute materially false statements include the omission of several million dollars in guaranties on a financial statement to a lending institution (*In re Ross*, 180 B.R. at 127–28); and asserting property ownership of property that the debtor did not, in fact, own (*Citizens Bank of Maryland v. Broyles (In re Broyles)*, 55 F.3d 980, 981–82 (4th Cir. 1995)).

■ Elrod's argument under Section 523(a)(2)(B) focuses on the section of the Note that refers to two properties, 582 West Ocean View Avenue, Norfolk, Virginia, and 1000 East Ocean View Avenue, Norfolk, Virginia. More particularly, Elrod focuses on one sentence within the Note: "The indebtedness evidenced by this note is secured by the proceeds to be distributed from any transaction concerning the maker's residence, located at 582 West Ocean View Avenue, Norfolk, Virginia, 23503, or any proceeds resulting from the property located at 1000 East Ocean View Avenue, Norfolk, Virginia." Pl.Ex. 10. Elrod argues that the phrase "the maker's residence" constitutes a false representation as to property ownership and thus financial condition, and that such statement was used to deceive him. Further, Elrod argues that the phrase "from the property located at 1000 East Ocean View Avenue" falsely implies property ownership, thus bringing the statement under Section 523(a)(2)(B) as a materially false statement of financial condition.

Bowden, however, argues that the Note does not represent any property ownership, but instead references proceeds from any transactions affecting those properties. Therefore, Bowden argues, the statements contained in the Note do not constitute statements of financial condition in light of the narrow view taken by courts when viewing financial statements under Section 523(a)(2)(B), as statements regarding the

source of repayment do not meet those criteria. Even if the Court finds these statements to be ones of financial condition, Bowden argues that Elrod has not met his burden of proof in showing that he acted as a prudent man in extending the loan to him.

The Court finds that the statements referencing the properties at 582 West Ocean View Avenue and 1000 East Ocean View Avenue do not constitute assertions of property ownership such that the statements represent Bowden's financial condition. Even given the breadth of which the Fourth Circuit will consider statements of financial condition, the plain language of the statements referring to these two properties do not expressly or impliedly refer to property ownership. While an individual certainly *can* own the property where he resides, that is surely not always the case. Similarly, references to proceeds from other property that does not serve as an individual's residence does not necessarily imply any property ownership rights. The statement is what it is: a statement that Elrod would be repaid from proceeds of certain transactions. The statement does not expressly nor impliedly assert any property ownership rights. The Court can envision several such instances where transactions concerning property not owned by an individual could result in proceeds to a non-owner recipient, the most obvious of which would be where the non-owner recipient was owed funds by the owner of such property, the latter of whom was in the process of selling said property. The remittance of those funds by the property owner to the non-owner recipient to repay the property owner's debts certainly would not give rise to any property ownership rights to the non-owner recipient.

The instant matter is more akin not to those cases cited above but instead to

*United Virginia Bank v. Cook* (*In re Cook*), 46 B.R. 545, 550–51 (Bankr.E.D.Va. 1985). In that case, this Court found that a list of equipment submitted by the debtor/borrower to secure a loan did not constitute a statement of financial condition because, on its face, it did not purport to be a list of property owned by the debtor. Instead, the Court found that "the document cannot be materially false in and of itself inasmuch as it merely purports to be what it is—a list of equipment and fixtures present" in the debtor's restaurant premises. *Id.* at 550. Also contributing to the Court's finding in that case was that the list contained several items that were clearly denoted as items of the debtor's personal property that would be removed from the restaurant. The Court found that the document was at best ambiguous in nature, especially in light of other information contained in the lending institution's files and the fact that the list contained no valuation for the items contained therein. *Id.* at 550–51.

Likewise, the statements in the instant case are ambiguous at best with regard to property ownership such as to find that a statement of financial condition was made. No valuation of either property was listed in the Note, and to be sure, no further details regarding any transactions for either property were included that would enable one to deduce a value of the properties.

To the extent Elrod would allege that any other statements made by Bowden regarding his alleged ownership of one or both of these properties constitute statements of financial condition or that these statements should be taken in conjunction with the written statements in the Note, such statements cannot be considered if those statements are not in writing. Such would include oral statements made by Bowden regarding real estate transac-

tions that he expected to close within a short period of time following the loan. *See, e.g., Blackwell v. Dabney (In re Blackwell)*, 702 F.2d 490, 492 (4th Cir.1983) (holding that oral statements regarding the success of the debtor's business, which were essentially puffing, did not fall within the purview of § 523(a)(2)(B) because the statements were made orally).

### 2. Did Elrod Reasonably Rely on Any Written Statement of Financial Condition Made by Bowden?

■■■■■ Section 523(a)(2)(B) expressly imparts a "reasonable person" standard upon the analysis under this subsection. In *Field v. Mans*, 516 U.S. 59, 116 S.Ct. 437, 133 L.Ed.2d 351 (1995), the Supreme Court contrasted the reasonable reliance standard with that of justifiable reliance. In the discussion, the Court focused on the stricter aspect of the reasonable reliance standard, which requires a showing that reliance was reasonable under the "hypothetical average person" standard. *Id.* at 71–75, 116 S.Ct. 437. To establish reasonable reliance upon a false statement of financial condition, a creditor must prove that reliance was objectively reasonable and that there was actual reliance. *I.H. Mississippi Valley Credit Union v. O'Connor (In re O'Connor)*, 149 B.R. 802, 809 (Bankr.E.D.Va.1993) (citing *Dominion Bank v. Wingo (In re Wingo)*, 112 B.R. 141 (W.D.Va.1990)). Reasonable reliance is to be objectively determined by the fact finder given the totality of the circumstances. *Id.* (citing *Fed. Deposit Ins. Corp. v. Figge (In re Figge)*, 94 B.R. 654, 665 (Bankr.C.D.Cal.1988)).

■■■■ As noted above, another aspect of reasonable reliance is whether the creditor required the debtor to furnish a financial statement as part of the credit transaction. *See Riggs Nat'l Bank of Washington, D.C. v. Ross (In re Ross)*, 180 B.R. 121, 128 (Bankr.E.D.Va.1994) (quoting *Paterno Imports, Ltd. v. McBee (In re McBee)*, 167 B.R. 827, 830 (Bankr.E.D.Va.1994)); *Southeast Assocs. of Durham v. Jacobe (In re Jacobe)*, 121 B.R. 299, 304 (Bankr. E.D.Va.1990). Incumbent within this showing is that the financial statement "must have been a substantial consideration or a contributory cause for the creditor's accepting the transaction." *In re Ross*, 180 B.R. at 128 (quoting *In re McBee*, 167 B.R. at 830).

■■■■ Even assuming that the statement within the Note regarding the two properties does constitute a written statement of financial condition, the Court would find that Elrod did not reasonably rely on such statement. As stated above, one of the aspects of reasonable reliance is that Elrod must prove that the debtor was under a duty to provide a financial statement as part of the credit transaction. No evidence has been adduced to prove that Bowden was under any duty to make any disclosures as to his financial condition in the course of the loan transaction. To be sure, Elrod did testify that he asked for assurances of repayment, and oral statements were made to this effect by Bowden, in addition to any statement(s) contained within the Note. The Court finds, however, that Elrod never required Bowden to provide him any type of financial statement prior to making the loan. Both parties affirmatively testified to this fact. *See* Tr. at 28–29, 121, 125.

Even if the Court were to find that Elrod required Bowden to supply such a financial condition statement, the evidence would fail as to whether Elrod gave substantial consideration to this statement in deciding to make the loan or that the statements were a contributory cause to that extent. The course of events surrounding the loan transaction show that the execution of the Note *followed* a dis-

cussion as to the purpose of the loan and Elrod's consent to lend the money. There is no evidence before the Court that would lead it to conclude that Elrod based his decision, even in part, upon the statement made in the Note.

Therefore, the Court finds that, even if the statement did constitute one of financial condition, Elrod has not shown that he reasonably relied upon such statement.

### 3. Did Bowden Make or Publish the Statement With Intent to Deceive?

■■■■ As with the requirement under Section 523(a)(2)(A), Section 523(a)(2)(B) also requires a showing that the debtor intended to deceive the creditor. Such may be shown by proving that the debtor knew that the written statement he was making was false or that he recklessly made such statement. The showing of intent to deceive under this section, as under Section 523(a)(2)(A), may be proven by persuasive circumstantial evidence. *In re Ross,* 180 B.R. at 129–30 (citing *Bartl v. Garfinkel (In re Claxton),* 30 B.R. 199, 212 (Bankr.E.D.Va.1983)).

■■■■ Even if this Court were to find that the first three elements of Section 523(a)(2)(B) were satisfied, Elrod has not met his burden of proof that Bowden made such written statements with the intent to deceive him. While Bowden may have made oral statements with the intent to deceive Elrod, as the Court has so found above, the evidence falls short as to whether Bowden intended to deceive Elrod with the written statement contained in the Note. On a more basic level, the statements themselves were not false because Bowden, admittedly, had no property ownership interest in either of the two properties; he merely resided at one (though he did disclaim a potential interest in the 582 West Ocean View Avenue property prior

to the instant transaction), and worked at the other.

Therefore, the Court finds that Elrod has not met his burden of proof with respect to this element of Section 523(a)(2)(B), nor has he met his overall burden of proof with respect to Section 523(a)(2)(B) as a whole. As a result, Section 523(a)(2)(B) does not bar dischargeability of the indebtedness at issue.

### C. *What is the Appropriate Interest Rate on the Note?*

■■■■ As the Court has found that Elrod has suffered damages as a proximate result of Bowden's misrepresentations under Section 523(a)(2)(A), the next proper inquiry is what, if any, is the appropriate interest rate or amount to assess upon the Note.

It is undisputed that the parties agreed that Elrod would lend Bowden $25,000.00 and that the Note provides for repayment by Bowden to Elrod of $27,500.00 by February 23, 2003. Pl.Ex. 10. Specifically, the Note provides:

FOR VALUE RECEIVED, the undersigned [C. Earl Bowden] promises to pay to the order of ROBERT ELROD & /OR ASSIGNS, at 1342 Laurel Cres., or at such other place as the Noteholder may designate in writing, the sum of TWENTY SEVEN THOUSAND FIVE HUNDRED DOLLARS ($27,500.00) to include interest. Such principal and interest to be payable in full on or before the 23rd day of Feb., 2003.

*Id.*

It is further undisputed that, after Bowden failed to repay the $27,500.00 by February 23, 2003, he had communication with the Elrods in March, 2003, during which he agreed to repay $30,000.00 instead of the previously agreed upon $27,500.00. Bowden agreed to repay this amount by approximately April 15, 2003. By letter

dated April 29, 2003, he confirmed his agreement to repay $30,000.00 instead of the $27,500.00 amount in the Note. Pl.Ex. 14. Finally, it is undisputed that Bowden repaid $10,000.00 of the loan in two separate $5,000.00 payments, one in April, 2003, and the other in June, 2003.

The parties' disagreement arises as to whether the Note and later modification contained an interest rate provision or whether the agreement was for a fixed dollar amount of return on the loaned amount.

Elrod asserts while the Note does not specifically refer to interest, it does refer to a "repayment rate" and that this was essentially the interest rate on the loan. Elrod cites to the pertinent Virginia Code section in support of his argument that it is proper to assess interest on the remaining amount due under the Note. Virginia Code Section 8.3A–112 provides as follows:

(a) Unless otherwise provided in the instrument, (i) an instrument is not payable with interest, and (ii) interest on an interest-bearing instrument is payable from the date of the instrument.

(b) Interest may be stated in an instrument as a fixed or variable amount of money, or it may be expressed as a fixed or variable rate or rates. The amount or rate of interest may be stated or described in the instrument in any manner and may require reference to information not contained in the instrument. If an instrument provides for interest but the amount of the interest payable cannot be ascertained from the description, interest is payable at the judgment rate in effect at the place of payment of the instrument and at the time interest first accrues.

Va.Code Ann. § 8.3A–112 (2004).

Elrod focuses on the language that states that the interest rate may be stated in any manner and may require reference to information not found in the Note. Elrod further argues that the Note makes reference to a "repayment rate," and that rate should be properly computed from the difference between the amount lent ($25,-000.00) and the amount that was to be repaid ($27,500.00), and an extrapolation of that difference over the two-month period of time of the loan. Elrod thus argues that the appropriate interest rate is sixty percent, and that his damages total $48,892.67. Elrod alternatively argues that if the Court finds that the judgment rate of interest is the appropriate rate (the judgment rate being nine percent), his damages would be $24,602.65.

Bowden, on the other hand, argues that the loan does not provide for interest but rather, that the loan provides for a return over a fixed period of time. Bowden refers to the additional sums above the $25,000.00 lent as "profit" to Elrod for making the loan. Finally, Bowden argues that if the Court does find that an interest rate should be assessed, the appropriate interest rate would be the judgment rate in Virginia. Both parties agree that the applicable judgment rate of interest in Virginia is nine percent.

After exhaustive research, the Court is unable to find any case law that directly addresses a situation similar to that in the instant case. However, the statutory language and the language from the Note reveal that Elrod's arguments cannot prevail. The Court finds that the language in the Note is more clear and straightforward than Elrod argues, in that the Note states that the sum to be repaid ($27,500.00) is *"to include interest."* The Court, as more fully articulated below, is unable discern any language in the Note referring to a "repayment *rate*," as Elrod suggests.

Neither party has directly addressed (though Bowden does allude to) what the Court views as the pertinent language from Virginia Code § 8.3A–112(b) regarding the fact that "[i]nterest may be stated in an instrument *as a fixed or variable amount of money,* or it may be expressed as a fixed or variable rate or rates." Va. Code Ann. § 8.3A–112(b) (2004) (emphasis added). The language of the Note provides for interest as a fixed amount of money, in that the plain language of the Note states that the repayment sum of $27,500.00 is "to include interest."

▮▮▮▮ The Court cannot make a new contract for the parties. The Note is what it is, and the Court's role with regard to the Note is to determine the intent of the parties at the time the Note was signed and, in this case, at the time the subsequent agreement to repay the $30,000.00 was made. The rules of construction for contracts within the Commonwealth of Virginia, in which the Note was undisputably signed and in which both Elrod and Bowden reside, control the Court's interpretation. As announced by the Supreme Court of Virginia:

> It is the function of the court to construe the contract made by the parties, not to make a contract for them. The question for the court is what did the parties agree to as evidenced by their contract. The guiding light in the construction of a contract is the intention of the parties as expressed by them in the words they have used, and courts are bound to say that the parties intended what the written instrument plainly declares.

*Wilson v. Holyfield,* 227 Va. 184, 187, 313 S.E.2d 396, 398 (Va.1984) (quoting *Meade v. Wallen,* 226 Va. 465, 467, 311 S.E.2d 103, 104 (Va.1984)).

▮▮▮▮ The only interest, or perhaps more appropriately phrased, rate of return, that is provided for in the Note is the agreement to pay a sum certain over and above the amount originally advanced by Elrod. The Court will not impute another amount or additional percentage of interest above that which has been provided for in the parties' agreements, as such action would be in contravention to the overriding principle that a court must not read additional language into a contract that would add or subtract from the language contained therein. *Southerland v. Southerland,* 249 Va. 584, 590, 457 S.E.2d 375, 378 (Va.1995); *Wilson,* 227 Va. at 187, 313 S.E.2d at 398. The intent of the parties at the time of the agreement shall govern. *Quadros & Assocs., P.C. v. City of Hampton,* 268 Va. 50, 54, 597 S.E.2d 90, 93 (Va.2004) (citing *Golding v. Floyd,* 261 Va. 190, 192, 539 S.E.2d 735, 737 (Va.2001)). As a result, the Court finds that the Note's only provision for interest is that which is included in the sum of $27,500.00, the amount that the parties agreed was to be repaid by the February 23, 2003, deadline. No evidence has been offered to suggest that the Note does not embody the parties' full agreement. Further, the Court finds that there is no evidence before it that would indicate that Bowden's subsequent agreement to repay $30,000.00 was not also intended to include a fixed amount of interest in so much as he bound himself to pay an additional $2,500.00 above the previously agreed to amount.

In addition, the Court notes that it can find little evidence of what incentive Bowden would have had to make a subsequent agreement to pay Elrod an additional $2,500.00 over and above what the Note stated ($27,500.00) if the Note had been accruing interest. Neither party sheds any light on this matter. Further, there is no further explanation as to why, if the Note was accruing interest, no mention was made of such interest at the time the parties orally modified the Note to provide

for payment of $30,000.00 instead of $27,500.00.

To the extent that Elrod would argue that he was disadvantaged and suffered from lost opportunity costs from the use of his money because Bowden filed for bankruptcy and thus he was precluded from seeking a judgment in the state court system, the Court is unable to fashion any type of legal or equitable remedy to this extent, as again, such would be in contravention to the principles regarding contract interpretation.

Therefore, the Court finds that interest was provided for as part of the total, initial $27,500.00 amount to be repaid and likewise included in the later agreed-upon $30,000.00 amount, and no other interest amount will be assessed.

### D. *Attorney Fees*

It is undisputed that Bowden did repay $10,000.00 of the loan to Elrod. Further, the Court has found that the amount of $20,000.00, representing the remaining indebtedness, is nondischargeable. Thus, any assessment of attorney fees must account for these facts. Bowden argues that the attorney fee calculation should be based upon the principal balance alone, and not the amount of the accrued interest, if any. Bowden further takes issue with the fact that Elrod is attempting to collect attorney fees without an attorney fee application or further evidence as to the reasonableness of those fees.

The United States Supreme Court announced the general rule regarding the award of attorney fees in *Alyeska Pipeline*

*Service Co. v. Wilderness Society,* 421 U.S. 240, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975). In *Alyeska,* a pipeline company challenged the ruling of the Court of Appeals for the District of Columbia Circuit, which ordered the pipeline company to pay one-half of the legal fees incurred by the opposing environmental group's suit to bar construction of the Trans–Alaska pipeline by invoking the "private attorney general" rule, finding that the environmental group had "acted to vindicate 'important statutory rights of all citizens' and had ensured that the governmental system functioned properly." *Id.* at 241, 245 95 S.Ct. 1612 (quoting *Wilderness Soc'y v. Morton,* 495 F.2d 1026, 1032 (D.C.Cir.1974), *rev'd, Alyeska Pipeline Serv. Co. v. Wilderness Soc'y,* 421 U.S. 240, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975)). The Supreme Court reversed the Court of Appeals and held that, absent a statute or an enforceable contract, "[i]n the United States, the prevailing litigant is ordinarily not entitled to collect a reasonable attorneys' fee from the loser."[8] *Id.* at 247, 257, 95 S.Ct. 1612.

The Supreme Court has considered the issue of an award of attorney fees in the specific context of the 11 U.S.C. § 523(a)(2) fraud exception to dischargeability. In *Cohen v. de la Cruz,* 523 U.S. 213, 118 S.Ct. 1212, 140 L.Ed.2d 341 (1998), a locality administrator, pursuant to a rent control ordinance, ordered the landlord, Cohen, to refund certain rent overcharges to various tenants. *Id.* at 215, 118 S.Ct. 1212. Cohen thereafter filed a petition under Chapter 7 of the Bankruptcy Code, and the tenants responded by

---

**8.** The Supreme Court.found that applying the "private attorney general" rule "would immediately collide with the express provision of 28 U.S.C. 2412," which "permits costs to be taxed against the United States, 'but not including the fees and expenses of attorney,' in any civil action brought by or against the United States or any agency or official of the

United States acting in an official capacity." *Alyeska,* 421 U.S. at 266–67, 95 S.Ct. 1612. The Court reasoned that, if attorney fees were allowed to be assessed against the pipeline company, it would follow that attorney fees could be awarded against a government agency, a path clearly in contravention of Section 2412 on its face. *Id.* at 267, 95 S.Ct. 1612.

filing a complaint to deny the dischargeability of their debt from Cohen pursuant to Section 523(a)(2)(A). *Id.* The tenants were awarded punitive damages, attorney fees, and costs under a New Jersey consumer fraud statute. Cohen appealed and sought discharge of the punitive damages and attorney fees. *Id.* at 216, 118 S.Ct. 1212.

The Court concluded that the language and history of § 523 required more than restitution, and the "debt" obtained by fraud included treble damages and attorney fees:

> In short, the text of § 523(a)(2)(A), the meaning of parallel provisions in the statute, the historical pedigree of the fraud exception, and the general policy underlying the exceptions to discharge all support our conclusion that "any debt . . . for money, property, services, or . . . credit, to the extent obtained by" fraud encompasses any liability arising from money, property, etc., that is fraudulently obtained, including treble damages, attorney's fees, and other relief that may exceed the value obtained by the debtor.

*Id.* at 223, 118 S.Ct. 1212.

Cases decided subsequent to *Cohen* have applied the holding in the context of other state statutes permitting an award of attorney fees. *See, e.g., Fowler v. Garey (In re Garey)*, 258 B.R. 356, 361–62 (Bankr. E.D.Va.2000) (considering an award of attorney fees under the Virginia Consumer Protection Act). Other cases have considered *Cohen* in the context of non-statutory contractual provisions permitting an award of attorney fees. *Wegmans Food Markets, Inc. v. Lutgen (In re Lutgen)*, No. 98–CV–0764E, 1999 WL 222605 (W.D.N.Y. Apr. 5, 1999) is illustrative. There, the debtor, Lutgen, had entered into a check-cashing agreement with Wegman's where Lutgen had stipulated to pay, in the event of default, all of Wegman's costs of collec-

tion, including attorney fees. Wegman's argued that *Cohen* excepted from discharge its contractual claim of attorney fees. The bankruptcy court disagreed, finding *Cohen* did not address dischargeability of legal fees in the absence of a state statute permitting their award, and therefore, the "American Rule" was relied upon to have each litigant bear its own legal expenses. *Id.* at *1.

The District Court noted that a number of courts in other Circuits had concluded that a debtor's contractual obligation to pay a creditor's collection costs, including attorney fees, is non-dischargeable when such costs are incurred in obtaining a judgment of nondischargeability under Section 523(a)(2) with respect to money obtained from that creditor through fraud. *Id.* at *2 (citing *Alport v. Ritter (In re Alport)*, 144 F.3d 1163, 1167–68 (8th Cir.1998); *In re Sheridan*, 105 F.3d 1164, 1166 (7th Cir.1997); *Luce v. First Equip. Leasing Corp. (In re Luce)*, 960 F.2d 1277, 1286 (5th Cir.1992); *Tran-South Fin. Corp. of Florida v. Johnson*, 931 F.2d 1505, 1506–09 (11th Cir.1991); *Martin v. Bank of Germantown (In re Martin)*, 761 F.2d 1163, 1167–68 (6th Cir. 1985)). The District Court concluded that the reasoning of *Cohen* supported the non-dischargeability of a debtor's contractual obligation to pay collection costs:

> This Court finds that the reasoning underlying the decision in *Cohen* supports the rule of the above-cited line of cases and that such rule governs this case. Wegmans claims—and Lutgen has foregone his opportunity to deny—that it has a contractual right to payment of any attorney's fees it incurs in collecting on Lutgen's bad checks. Judge Kaplan's reasoning—that such right is unenforceable because Lutgen has since filed a petition seeking bankruptcy relief and that he is therefore entitled to a dis-

charge of any contractual obligation—evinces a faulty analysis. This Court finds that, under *Cohen,* the proper inquiry is whether—irrespective of the circumstance that the debtor has filed a bankruptcy petition—the defrauded creditor has a right to payment that is enforceable under state law. It is established that Wegmans had such a right; there is no claim that its right is not enforceable under state law. Consequently, Wegmans' right to payment of its attorney's fees constitutes a "debt" that, having resulted from Lutgen's fraud, is non-dischargeable pursuant to 11 U.S.C. § 523(a)(2)(A).

*Id.* at *3. *See also Merchants Nat'l Bank of Winona v. Moen (In re Moen),* 238 B.R. 785, 795–96 (8th Cir. BAP 1999) (attorney fees were properly awarded where "[t]he terms of the Equity Credit Agreement unequivocally provide [the debtor] will pay the reasonable attorney's fees expended by Merchants to collect any debt which arose out of [the debtor's] use of the special purpose checks."). Accordingly, "after *Cohen,* the determinative question in cases under § 523(a)(2) is whether the successful plaintiff could recover attorney's fees in a non-bankruptcy court." *AT & T Universal Card Servs. Corp. v. Hung Tan Pham (In re Hung Tan Pham),* 250 B.R. 93, 99 (9th Cir. BAP 2000); *accord, Buffalo Gyn Womenservices, Inc. v. Behn (In re Behn),* 242 B.R. 229, 241 (Bankr.W.D.N.Y.1999).

■■■■■ While a provision in a note to pay an attorney's fee incurred in collecting the note is binding on the parties to the note, a Virginia court has the power to reduce the amount if found to be unreasonable or unconscionable. *First Am. Bank v. MacDonald,* 30 Va. Cir. 299, 1993 WL 946014, at *1 (Va. Cir. Ct.1993) (citing *Richardson v. Breeding,* 167 Va. 30, 33, 187 S.E. 454, 455 (Va.1936); *Cox v. Hagan,* 125 Va. 656, 673, 100 S.E. 666, 673 (Va. 1919); *Triplett v. Second Nat'l Bank,* 121 Va. 189, 193, 92 S.E. 897, 898 (Va.1917)). However, a fee stipulated by contract is *prima facie* reasonable and should be paid unless excessive or unreasonable. *Id.* at *2 (citing *Parksley Nat'l Bank v. Accomack Banking Co.,* 166 Va. 459, 462, 186 S.E. 38, 39 (Va.1936); *Conway v. Am. Nat'l Bank of Danville,* 146 Va. 357, 364–65, 131 S.E. 803, 805 (Va.1926)). "Thus, the burden is on the defendant to prove that the plaintiff did not incur the amount expressed in the agreement or that the fee agreed upon was excessive or unreasonable." *Id.* (citing *Conway,* 146 Va. at 364–65, 131 S.E. at 805).

■■■■ This Court finds that a Virginia court would not reduce the attorney fees provided for in the Note on the basis of unreasonableness or unconscionability. Here, the Note provides for payment of "all reasonable costs and expenses" of a suit to collect the Note, "including, but not limited to, reasonable attorney's fees of twenty (20) percent." Pl.Ex. 10. The provisions of the Note, therefore, stipulate attorney fees of twenty percent (20%) of the Note.[9] Elrod put on no evidence of

---

**9.** While the Note provisions state that the Noteholder shall be entitled to collect all reasonable costs and expenses of a suit to collect the Note, including "reasonable attorney's fees of twenty (20) percent," the Court construes the addition of the word "reasonable" in the relevant clause as not requiring Elrod to present evidence of the reasonableness of the fees sought. Rather, because the clause includes a specific percentage, it appears the intent of this provision is to provide for an award of the attorney fees based upon the agreed percentage therein. This provision also omits a description that the agreed-upon fees are a percentage of the outstanding balance of the Note, but the context of this language drafted by Bowden convinces the Court that the intention of the parties was that the agreed-upon fees are twenty percent

attorney fees incurred, except the relied-upon Note provision. As a presumption of reasonableness attaches to the percentage fixed for attorney fees in the Note to cover the attorney fees incurred and anticipated, and no evidence was adduced by Bowden to contravene this presumption, this Court believes a Virginia court would award Elrod attorney fees equal to twenty percent (20%) of the balance of the Note at the time of the initiation of the Complaint.

The Note plainly provides for reasonable attorney fees in the amount of twenty percent in the event that action is taken to collect on the Note.[10] That condition is clearly met here. With that condition met, the Court finds that Bowden is liable for attorney fees in the amount of $4,000.00 (twenty percent of the $20,000.00 amount that the Court has determined to be non-dischargeable). Because the attorney fees are being awarded on the basis of contract law and not as an application for compensation before this Court under the Bankruptcy Code, this Court concludes that further evidence as to the reasonableness of the amount of the attorney fees is not needed.

■■■■■ An alternative basis also exists for an award of attorney fees to Elrod.[11] Thus, we next examine Virginia law to determine if Elrod would be awarded attorney fees if he had pursued a fraud action in a non-bankruptcy court. The Commonwealth of Virginia follows the American Rule, and as in *Alyeska Pipeline Service Co. v. Wilderness Society*, 421 U.S. 240, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975), "in the absence of a statute or contract to the contrary, a [Virginia] court may not award attorney's fees to the prevailing party." *Prospect Dev. Co. v. Bershader*, 258 Va. 75, 92, 515 S.E.2d 291, 300 (Va. 1999). As in federal law, certain exceptions to the American Rule exist in the state law context. One exception allows

---

of the balance of the Note, as is commonly provided for in similar instruments.

10. One court has suggested that a prevailing creditor in a nondischargeability proceeding is entitled to contractual attorney fees under state law if the bankruptcy court adjudicates a contract action in connection with the nondischargeability proceeding. *AT & T Universal Card Servs. Corp. v. Hung Tan Pham (In re Hung Tan Pham)*, 250 B.R. 93, 96 (9th Cir. BAP 2000) (citing *Younie v. Gonya (In re Younie)*, 211 B.R. 367, 377 (9th Cir. BAP 1997), *aff'd*, 163 F.3d 609 (9th Cir.1988) (unpublished table decision)). Accordingly, when the complaint did not expressly specify breach of contract as a ground of relief, it was appropriate to allocate all the fees to the nondischargeability cause of action, necessitating the trial court to consider whether the plaintiff was entitled to recover fees pursuant to a contractual provision in litigation of a tort (fraud) claim under California law. *Id.* at 96, 99. Here, the plaintiff, Elrod, specifically plead for an entry of judgment under state law on the Note and devoted a substantial portion of the trial to determination of what amounts were due under the provisions of the

Note. *See also Sea Win, Inc. v. Tran (In re Tran)*, 301 B.R. 576, 584 (Bankr.S.D.Cal. 2003) (where credit agreement provided for payment of collection costs "to collect any amount due under the agreement," the "contractual attorneys' fees provision in the credit agreement authorizes [the creditor] to recover its attorneys' fees for litigating a dischargeability claim to collect a debt").

11. Some courts have held that, after *Cohen*, in an instance of litigation of a claim of nondischargeability under Section 523(a)(2)(A) where there was no adjudication of a contract action in connection with the bankruptcy proceeding, the court should consider whether there is a basis to recover attorney fees in a fraud action under state law. *See, e.g., AT & T Universal Card Servs. Corp. v. Hung Tan Pham (In re Hung Tan Pham)*, 250 B.R. 93, 96–99 (9th Cir. BAP 2000). While this Court believes there is a sound basis for an award of attorney fees to Elrod under the provisions of the Note, nonetheless, we will analyze the entitlement of Elrod to attorney fees under Virginia law if the complaint here were deemed to be a Virginia state court proceeding for fraud.

for attorney fees where a cause of action for malicious prosecution or false imprisonment has been prosecuted. *Id.* at 92, 515 S.E.2d at 301 (citing *Burruss v. Hines,* 94 Va. 413, 420, 26 S.E. 875, 878 (Va.1897)). A second exception allows state courts to award attorney fees "where a breach of contract has forced the plaintiff to maintain or defend a suit with a third person," so long as those fees are reasonable. *Id.* (citing *Owen v. Shelton,* 221 Va. 1051, 1055–56, 277 S.E.2d 189, 192 (Va.1981); *Hiss v. Friedberg,* 201 Va. 572, 577–78, 112 S.E.2d 871, 875–76 (Va.1960)).

In *Prospect Development Co. v. Bershader,* the Supreme Court of Virginia affirmed the circuit court's judgment, which found, among other things, that Bershader, the ·purchaser of property from the defendant development company, was entitled to an award of attorney fees as a result of the development company's actual and constructive fraudulent behavior. *Id.* at 85, 92, 515 S.E.2d at 297, 301. The court held that "in a fraud suit, a chancellor, in the exercise of his discretion, may award attorney's fees to a defrauded party ... [when] the defendant[ ] engag[es] in callous, deliberate, deceitful acts that [demonstrate] a pattern of misconduct." *Id.* In so holding, the court cautioned that such an award was not automatic, but that "the circumstances surrounding the fraudulent acts and the nature of the relief granted to the defrauded party" should be considered when determining whether to award attorney fees. *Id.* at 92, 515 S.E.2d at 301.

 In reaching its conclusion, the *Bershader* Court outlined the elements for both actual and constructive fraud under Virginia law. With respect to actual fraud, a plaintiff must prove by clear and convincing evidence: "(1) a false representation, (2) of a material fact, (3) made intentionally and knowingly, (4) with intent to mislead, (5) reliance by the party misled,

and (6) resulting damage to the party misled." *Id.* at 85, 515 S.E.2d at 297. To prove constructive fraud, a plaintiff must show, again by clear and convincing evidence, that " 'a false representation of a material fact was made innocently or negligently, and the injured party was damaged as a result of his reliance upon the misrepresentation.' " *Id.* at 86, 515 S.E.2d at 297 (quoting *Blair Constr., Inc. v. Weatherford,* 253 Va. 343, 346–47, 485 S.E.2d 137, 138–39 (Va.1997)). Additionally, the plaintiff must prove " 'that one has represented as true what is really false in such a way as to induce a reasonable person to believe it, with the intent that the person will act upon this misrepresentation.' " *Id.* (quoting *Evaluation Research Corp. v. Alequin,* 247 Va. 143, 148, 439 S.E.2d 387, 390 (Va. 1994)). Upon finding that the plaintiffs in *Bershader* had proven all of the elements of both actual and constructive fraud by clear and convincing evidence, the court reached the conclusion set forth above, that those who engage in "callous, deliberate, deceitful acts" should be liable for the attorney fees incurred by a defrauded party.

 This Court believes that a Virginia court would award attorney fees in this case. The elements of actual fraud under Virginia law are substantially similar to those under Section 523. Further, while Bowden's acts may not rise to the extreme level as those engaged in by the defendants in *Bershader,* they certainly meet the requirements of an intentional and knowing, false misrepresentation made with the intent to mislead and made to induce Elrod to rely upon them. Thus, with the elements of actual fraud met, we turn to the circumstances surrounding the fraudulent acts and the nature of the relief granted. As set forth above, Bowden engaged in fraudulent behavior by making a false representation as to the purpose of the loan in order to entice Elrod to lend him the funds. Bowden represented what

he believed would be the most likely scenario to induce Elrod to lend him the funds, and then used the funds to pay his $12,000.00 per month lifestyle expenses and take a vacation. In finding that these acts constitute false pretenses, false representations, and/or actual fraud pursuant to Section 523(a)(2)(A) of the Bankruptcy Code, the Court has declared the remaining debt of $20,000.00 to be nondischargeable.

Upon consideration of the surrounding circumstances and nature of relief granted, this Court finds that attorney fees under state law would be appropriate and awarded in this case. Elrod and Bowden made an agreement, based upon Bowden's misrepresentations, that Bowden would repay the loaned monies within a certain period of time. As the evidence shows, Elrod permitted Bowden a significant period of time after the due date for repayment without seeking any legal recourse. When Bowden filed bankruptcy, Elrod was prompted to protect his legal rights by filing a proof of claim and pursuing the instant nondischargeability action. Certainly, had Bowden repaid the funds, Elrod would not have needed to pursue the instant action. Therefore, the Court finds that Elrod would be awarded attorney fees in a non-bankruptcy court had he pursued a cause of action for fraud there.

As to Bowden's assertion that he should be awarded attorney fees under Section 523(d), the Court finds no basis to award such fees. Section 523(d) requires that the debt be determined to be dischargeable. The Court, as set forth above, has found in favor of Elrod on his claim under Section 523(a)(2)(A) and declared the underlying indebtedness nondischargeable, thus invalidating Bowden's request.

Therefore, the Court finds that Bowden is liable for attorney fees to Elrod in the amount of $4,000.00. Bowden is not entitled to any attorney fees.

## IV.

## SUMMARY

This Court concludes that Bowden received a loan from Elrod through false pretenses, false representations, and/or actual fraud pursuant to Section 523(a)(2)(A) of the Bankruptcy Code, and therefore, the underlying indebtedness in the amount of $20,000.00 is nondischargeable. The Court further finds that Elrod is not entitled to interest on this indebtedness. Finally, the Court finds that Bowden is liable for attorney fees in the amount of $4,000.00. Accordingly, the Court enters judgment against Bowden in favor of Elrod in the amount of $24,000.00, which judgment is nondischargeable pursuant to Section 523(a)(2)(A) of the United States Bankruptcy Code.

A separate order will issue.